(No. 35281.—

CLARA T. TIFFIN, Admrx., *et al.,* Appellants, *vs.* THE GREAT ATLANTIC AND PACIFIC TEA COMPANY *et al.,* Appellees.

*Opinion filed November 18, 1959.*

HUTSON & HUTSON, of Monticello, and JOHN ALAN APPLEMAN, of Urbana, for appellants.

KINDER & DEY, of Litchfield, and E. G. ROBBINS, of Chicago, for appellee Armour and Company; and BRUNSMAN & GIFFIN, of Springfield, for appellee The Great Atlantic and Pacific Tea Company.

Mr. JUSTICE DAILY delivered the opinion of the court:

Clara T. Tiffin, both individually and as administratrix of the Gail Tiffin estate, Thomas O. Tiffin, and Viva Tiffin filed a joint action in the circuit court of Montgomery County against The Great Atlantic and Pacific Tea Company and Armour and Company, corporations hereinafter referred to as A & P and Armour, respectively, to recover damages for a death and illnesses allegedly caused from the eating of unwholesome ham which had been purchased from A & P and processed by Armour. At the jury trial which followed, Clara T. Tiffin recovered judgment for $10,000, as administratrix, and for $1,000, individually, while each of the other plaintiffs received judgments for $250, all of said judgments being against the defendants jointly. Upon review the Appellate Court for the Third District reversed, holding that plaintiffs had not shown the ham was deleterious when it left the defendants' control and that the trial court erred in denying the defendants' motions for a directed verdict. (20 Ill. App. 2d 421.) We have granted leave to appeal for further review.

The record indicates that the ham in question was processed by Armour at its East St. Louis plant and was delivered to A & P's East St. Louis warehouse on June 4, 1953, in a shipment consisting of one hundred 100-lb. boxes of ham. Immediately upon receipt, from ten to fifteen per cent of the boxes were opened by A & P for inspection and each ham contained therein was unwrapped, examined for mould or other obvious defects, checked for fat content by pressing the thumb against the meat, and then rewrapped for further shipment. In addition, upon receipt at the ware-

house, about two per cent of the hams were spot checked for internal temperature by placing a needle point thermometer into the meat. The following day, June 5, the ham in question, along with five others, was sent by refrigerated truck from the East St. Louis warehouse to the A & P store in Litchfield where it was placed in the bottom of the store's dairy cooler. On the morning of June 11, 1953, plaintiff, Clara T. Tiffin, and her husband, Gail Tiffin, residents of Bement, Illinois, were summoned to Walshville because of the death of Gail Tiffin's father, and upon arriving it was decided to go to the nearby town of Litchfield to procure food for the many relatives who were expected for the funeral. Clara T. Tiffin arrived at the A & P store in Litchfield shortly before noon on June 11 and proceeded to purchase the ham in question, which weighed between 13 and 14 lbs. Upon removing the ham from the refrigerator, the store clerk offered to trim it for her whereupon he took the ham to the back of the store and a few minutes later returned with it fully wrapped. Clara T. Tiffin placed the ham in her automobile and drove to a nearby dairy to get some cottage cheese after which she continued on to the Albert Tiffin residence in Walshville, arriving about 1:00 P.M. After eating lunch the plaintiff then proceeded to the L. J. Osborn residence some seven miles away at which time the ham was unwrapped, examined, and then placed in the Osborn refrigerator where it remained until about 6:30 A.M. the following morning. The ham was then removed for cooking, put in a roaster, and placed in a 325° to 350° oven for approximately five hours during which time the internal temperature of the ham was at least 212° Fahrenheit. At about 11:30 A.M. the ham was pulling from the bone and appeared to be perfectly done, whereupon it was removed from the oven and placed on the top of the stove to cool. Shortly thereafter the ham, still enclosed in the roaster, was trans-

ported back to the Albert Tiffin residence in Walshville and allowed to cool at room temperature during the afternoon.

At approximately 5:00 P.M. enough meat was sliced vertically from the small end of the ham to feed seven individuals, who ate without ill effect, and after the meal was finished at about 6:00 P.M. the remainder of the ham was placed in the Tiffin refrigerator, which was described as relatively old. At about 8:00 A.M. the next morning, being June 13, the ham was removed from the refrigerator and from one-third to one-half of it was sliced and placed upon clean platters, whereupon both the sliced and unsliced portions were returned to the refrigerator around 9:00 A.M. Sometime before noon on the same morning the ham was again removed for further slicing but was returned to the refrigerator prior to serving. At about 11:30 A.M. the ham, along with chicken, cottage cheese, potato salad, jello salad, tossed salad, cake, coffee, and tea, was served buffet style at the Albert Tiffin residence to some fourteen relatives and friends, and after the meal was over the unused ham was again returned to the refrigerator.

At about 1:45 P.M. plaintiff Thomas O. Tiffin became violently ill and suffered from extreme vomiting and diarrhea. Some fifteen minutes later the deceased, Gail Tiffin, also showed similar symptoms, and at about 3:00 P.M. plaintiff Viva Tiffin experienced the same illness. Plaintiff Clara T. Tiffin became sick about 10:00 P.M. the same evening, and during the course of the day some five others who had eaten the ham suffered from vomiting and diarrhea. Those who were present at the noon meal on June 13 but who had not eaten any ham suffered no ill effects whatsoever. Although the afflicted individuals partook of other foods offered at the meal, it appears that the only food common to all was the ham in question. After varying periods of recuperation, all recovered except Gail Tiffin,

who was taken to a Litchfield hospital on the evening of June 13 and passed away on June 17, 1953.

At the request of the attending physician, the Montgomery County Health Department sanitarian went to the Albert Tiffin residence on the morning of June 14, 1953, and took samples of ham and cottage cheese which he placed in water sample bottles. Upon returning to his office the samples were put in a refrigerator until the following morning when they were sent, unrefrigerated, by mail to the State Department of Public Health in Springfield for examination. Although the identity of the specimens was not clearly established, on June 17 similar samples of ham and cottage cheese were examined in the State laboratory and the former was found to contain hemolytic staphylococci, a bacteria commonly associated with food poisoning.

Both by expert testimony and in their briefs to this court, the parties hereto have devoted considerable time to explaining the characteristics of staphylococci and their relationship to food poisoning itself. From this it may be concluded that such bacteria is microscopic in size and is commonly found in the home, upon the person and in the air. There are several types of staphylococci but only a limited number are hemolytic in nature, and even these are not poisonous in and of themselves. Rather, it is the toxin produced by growing hemolytic staphylococci that may be poisonous to the human being. Except for sterilization there is no way to completely eliminate this bacteria although its growth, and the accompanying toxin production, may be prevented by refrigeration. Staphylococci remains dormant at temperatures below 50° Fahrenheit and shows only little activity at 60° Fahrenheit. As the temperature increases the bacteria works more effectively, the ideal temperature for growth being 85° and 110° Fahrenheit, but beyond this point the bacteria again becomes inactive and is killed at a temperature of approximately 150°

Fahrenheit. The toxin produced by the bacteria, however, is not so susceptible to heat but may be boiled for as much as a half hour and still retain its activity. The symptoms of staphylococci food poisoning are abdominal cramping, nausea, vomiting, diarrhea, and marked prostration, and such symptoms usually appear from one to six hours after the contaminated food is eaten. Although the mortality rate is low, authentic fatal cases have been recorded.

At time of trial the attending physician, Dr. Frank B. Warner, after describing the symptoms displayed by Clara T. Tiffin and Gail Tiffin, expressed the opinion that the latter's death and the former's illness both resulted from food poisoning. He did reveal, however, that an X ray taken of the deceased on June 16 showed him to be suffering from broncho-pneumonia of the right lung. Dr. Max Appel, a pathologist, after examining slides of tissue taken from various organs of the deceased, was of the opinion that Gail Tiffin died of overwhelming toxemia. Although he pointed out that hemolytic staphylococci are capable of producing such a condition, he also recognized that there could be many other causes, and upon cross-examination admitted that from the slides alone he could not eliminate the possibility that pneumonia infection or some other inflammatory condition might have produced the toxemia. Neither could he explain why Dr. George McClure, another pathologist, had arrived at a contrary conclusion as to cause of death. Dr. Appel also stated that bacteria normally enter a media at a particular point, and until such bacteria have had the opportunity to spread through the entire media, it would be possible to find the organism in one part and not another.

For the defendants, Courtney Green, a U.S. Department of Agriculture meat inspector assigned to the Armour plant in East St. Louis, testified in great detail as to the care which is taken in selecting, killing, and processing hogs for

later consumption. He pointed out that it takes less than an hour to completely dress an animal and that thereafter the meat is kept at controlled temperatures of from 34° to 38° Fahrenheit until it is smoked. The temperature in the smoking room ranges from 160° to 185° and the internal temperature of the ham must be at least 137° Fahrenheit. Upon the completion of this process the ham is placed in in a chill room with a temperature of 38° and then wrapped and transported in 44° temperature. Lloyd Medley, an A & P buyer, stated that hams at the A & P warehouse were kept under temperatures not to exceed 42°, and the manager of A & P's Litchfield store pointed out that while in his possession the ham was kept under temperatures of from 36° to 40° Fahrenheit. M. L. Laing, chief chemist for Armour, told of conducting a cooking experiment with a 13 to 14 lb. ham which was cooked for five hours at a temperature of 325°. When the cooking was completed the ham had an internal temperature of 192° Fahrenheit and after being left at room temperature of 68° for 25 minutes the internal temperature rose to 200°. Five hours after the cooking was ended the internal temperature was 112° and after six hours it was 103°. The ham was then placed in a refrigerator with a temperature of 38° and after five hours of refrigeration the ham's internal temperature was 61°.

Dr. Gail Dack, a professor of microbiology, testified that in his opinion the constant refrigeration made it impossible for staphylococci bacteria, if present in the ham, to grow and thus produce toxin during the time it was under A & P and Armour's control, and that after cooking the ham was certainly free from any staphylococci bacteria. He did recognize, however, that it could have become contaminated following cooking, and that although toxin was being produced, there were not sufficient amounts at the evening meal on June 12 to cause illness. Other evidence

was introduced which showed the outdoor temperature between June 11 and June 13, 1953, ranged from a maximum of 96° to a minimum of 70° Fahrenheit.

The plaintiffs contend that Armour, as the manufacturer, and A & P, as the retailer, both impliedly warranted to the ultimate consumer that the ham was not only fit for human consumption when purchased by Clara T. Tiffin but also that it contained no bacteria which would cause contamination when later used for the purpose for which it was bought, and that there was sufficient evidence presented from which the jury could reasonably infer a breach of this warranty. The defendants, on the other hand, contend there was no evidence of the ham's contamination while in their control and that the trial court erred in refusing to direct a verdict on their behalf.

By furnishing food to the general public, the manufacturer and retailer both impliedly warrant that the product is fit for human consumption at the time it leaves their respective control, and where the food proves to be deleterious, either or both may be required to respond in damages to the injured consumer. (*Wiedeman* v. *Keller,* 171 Ill. 93; *Sharpe* v. *Danville Coca-Cola Bottling Co.* 9 Ill. App. 2d 175, 132 N.E.2d 442; 32 I.L.P. Sales, chap. 7, sec. 151.) However, since a manufacturer's product may pass through many hands before it reaches the ultimate user, public policy does not require the manufacturer to warrant that no one will tamper with or adulterate the food after it leaves his control and before it is received by the consumer, and where a party elects to hold the remote seller liable he must, in the absence of direct evidence of contamination by the manufacturer, prove that there was no opportunity for adulteration after it left the manufacturer's control (in which case there is an inference of contamination by the manufacturer) or, if there was a reasonable opportunity for later tampering, that no tampering or adulteration in fact occurred. (*Williams* v. *Paducah Coca*

*Cola Bottling Co.* 343 Ill. App. 1, 98 N.E.2d 164; *Boula-hanis* v. *Great Atlantic and Pacific Tea Co.* 348 Ill. App. 546, 109 N.E.2d 262; 32 I.L.P. Sales, chap. 7, sec. 151.) Here the undisputed evidence showed that the meat was processed by Armour, the manufacturer, under the strict control of the U.S. Department of Agriculture and that, except for smoking, the ham was at all times kept under refrigeration of 34° to 44° Fahrenheit, which was well below the temperature required for growth of staphylococci. There was no direct evidence, whatsoever, that any bacteria was in the ham when it left Armour's control, and even if there had been, uncontradicted expert testimony was offered by the defendants to show that under such temperature conditions no staphylococci growth or toxin production could have occurred. On the other hand, it was readily admitted that a portion of the hams were unwrapped, handled, and physically examined at the A & P warehouse and that the ham in question was trimmed and wrapped at the Litchfield store prior to its delivery to Clara T. Tiffin, thus affording considerable opportunity for adulteration by the common, air-borne staphylococci. This being the case, it was incumbent upon the plaintiffs to prove that no contamination did in fact result, but such proof was not forthcoming. To the contrary, they constantly suggested that the poison-producing bacteria were introduced into the ham during its handling by A & P. Therefore, in our opinion, the plaintiffs failed to offer any evidence, either direct or circumstantial, from which contamination by Armour could reasonably be inferred.

Neither was there any direct proof of contamination by A & P. Nevertheless, plaintiffs argue that there was sufficient circumstantial evidence to show either that the ham was unfit for human consumption when purchased from A & P or that at time of sale it contained a substance which, although not then poisonous, later caused the ham to become unwholesome when used for the purpose for which

it was sold. In support of this contention, they point out the opportunity for contamination while under A & P's control, the care exercised by plaintiffs in refrigerating and cooking the meat, the sanitary conditions of both the Tiffin and Osborn kitchens, the recognizable symptoms of food poisoning, and the subsequent laboratory finding of hemolytic staphylococci. Since this was not a hermetically sealed or sterile product it is quite possible that some types of bacteria were on the ham when purchased from A & P, and there was testimony to the effect that the illnesses were of a bacteriological origin. It does not necessarily follow, however, that there was a causal connection between the two. It must be remembered that it is the toxin produced by hemolytic staphylococci, and not the bacteria itself, which causes food poisoning, that such toxin is produced only at temperatures of from 50° to 110° Fahrenheit, and that the staphylococci die at temperatures in excess of 150°. Not only prior to sale but also prior to cooking, the ham in question was refrigerated almost constantly at temperatures which would have prevented the formation of poisonous toxins. The cooking itself took five hours and was done at an external temperature of at least 325° and an internal temperature of 212°, both readings being well above the thermal limit for staphylococci. Therefore, from the evidence presented, it would appear in all likelihood that no live bacteria remained when the ham was removed from the oven. This does not, of course, remove the possibility that, despite the refrigeration, in some manner toxin was in fact produced prior to cooking and, since it is considerably more heat resistant than the bacteria, that it continued to be active following the ham's removal from the oven. However, since toxin is produced only by live staphylococci, the amount therein would have remained constant until such time as new bacteria was introduced into the media. At the evening meal on June 12, enough meat was sliced to the bone from the small end of the

ham to serve seven people, and the fact that no one became sick indicates that at least this portion was free from toxin. Nevertheless, when further slicings were made the following day, everyone who ate therefrom became violently ill. To explain this happening and to discount the theory that the poisoning resulted from new bacteria introduced subsequent to cooking, plaintiffs point out that shortly after it enters a media, hemolytic staphylococci and its resulting toxin may be localized in a particular area, and that in such instances it would be possible to consume the non-contaminated part without ill effect. However, it must be noted such occurs only in the early stages of proliferation with a minimum of toxin then being produced and, if it is to explain the present situation, one must assume that, by chance, the entire uncontaminated portion was devoured at this particular meal and the whole toxic area left intact, for it appears that on the following day all the ham was unfit for consumption. On the other hand, the evidence shows that after it was taken from the oven, the ham was allowed to sit in the kitchen for six and one-half hours and then placed in the refrigerator after which it would take some five hours for the internal temperature of the ham to drop below the range of staphylococci growth. As pointed out in *Preventive Medicine,* Vol. XLI, No. 2, p. 565, which is quoted by plaintiffs in their brief, "It is believed by some that most contamination is acquired in the galley, and that the production of enterotoxin is favored by unduly long exposures to room temperature, warming ovens or steam plates."

Furthermore, it must be noted that although ham samples, which had allegedly been taken from the Tiffin home on June 14, were examined on June 17 and found to contain hemolytic staphylococci, they had been unrefrigerated for at least two days prior to examination, and even if the bacteria were then present, there was no showing when the contamination may have occurred. This is especially im-

portant when we consider that under ordinary circumstances the cooking on June 12 would have killed all live bacteria. Similarly, even if we consider only the medical evidence which indicated that the illnesses were caused by hemolytic staphylococci, and there was contrary evidence on this point, there still remains the void concerning their origin.

Liability may not be based on imagination, speculation, or mere conjecture, and the question of its existence should be submitted for jury determination only where there is some direct evidence supporting each material allegation of the complaint or some circumstantial evidence from which inferences of such facts clearly preponderate. (*Peterson & Co.* v. *Industrial Board,* 281 Ill. 326; *Ohio Building Safety Vault Co.* v. *Industrial Board,* 277 Ill. 96; *Merlo* v. *Public Service Co. of Northern Illinois,* 381 Ill. 300; *Chicago, Rock Island and Pacific Railway Co.* v. *Benson,* 352 Ill. 195; *Shaw* v. *Swift and Co.* 351 Ill. App. 135; 114 N.E.2d 330.) Here, the plaintiffs alleged the ham was unfit for human consumption when sold by A & P, and the burden was upon them to prove it. (*Wiedeman* v. *Keller,* 171 Ill. 93; *Boulahanis* v. *The Great Atlantic and Pacific Tea Co.* 348 Ill. App. 546, 109 N.E.2d 262.) The evidence which they presented, however, even when considered in its aspects most favorable to the plaintiffs, showed only that the illnesses may have resulted from staphylococci poisoning and that in all probability the ham was the contaminated agent. There was no competent proof that A & P was responsible in any manner for this occurrence. Although one could theorize that perhaps the bacteria was present at the time of purchase and by some means survived the cooking, there are other theories which are equally plausible under the facts of this case, particularly the suggestion that contamination may have occurred while the cooked ham was cooling. Be that as it may, certainly it cannot be said that plaintiffs have established their facts by circumstantial evidence where contrary facts may be inferred from the same

evidence with equal certainty. (*Chicago Union Traction Co.* v. *Hampe*, 228 Ill. 346; 18 I.L.P. Evidence, chap. 13, sec. 342.) In this respect, the present case is somewhat similar to *Bowman* v. *Woodway Stores, Inc.* 345 Ill. 110, where food poisoning had allegedly resulted from the use of evaporated milk. In denying recovery in that instance, we pointed out that even though there was the possibility that the milk was responsible, there were numerous other equally possible ways in which the poisoning might have occurred.

For the reasons stated, it is our opinion that the circuit court of Montgomery County erred in denying defendants' motions for directed verdicts and that the Appellate Court was correct in reversing that decision. Since plaintiffs failed to show either that the ham was unfit for consumption when purchased or that, although then wholesome, it contained the potentiality for later harm, it is unnecessary for us at this time to decide whether the implied warranty extended to the limits urged by them. The judgment of the Appellate Court for the Third District is therefore affirmed.

*Judgment affirmed.*