James Lashmett, Sr., Plaintiff-Appellee, v. Country Mutual Insurance Company, Defendant-Appellant.

Gen. No. 10,324.

Third District.

February 21, 1961.

Robinson, Foreman, Rammelkamp, Bradney & Hall, of Jacksonville, and L. Allan Watt, of Winchester, for appellant.

Hutchens & Mann, of Winchester, for appellee.

ROETH, JUSTICE.

This is an appeal from a judgment of the Circuit Court of Scott County, Illinois, which judgment was in the amount of $2,585.00 in favor of plaintiff and

against defendant. The case arose out of the death of swine owned by the plaintiff and insured by the defendant against certain risks. The jury returned a verdict in favor of the plaintiff in the amount of $3500.00 and judgment was entered thereon. Subsequently plaintiff filed a remittitur for $915.00 reducing the judgment to $2585.00. Defendant's post trial motion was denied and this appeal followed.

The policy issued by defendant to the plaintiff is one insuring farm personal property against certain risks. It covers livestock which by the terms of the policy is defined to include swine. The policy has the following provision in it:

"THEFT, VANDALISM AND MALICIOUS MISCHIEF AND OVERTURN CLAUSE. This insurance is extended to include direct loss by . . . vandalism and malicious mischief (as defined below) . . ."

There then follows this provision:

"The term 'Vandalism and Malicious Mischief' as used herein is restricted to and includes only wilful or malicious physical injury to or destruction of the described property."

Plaintiff's complaint alleges that certain of his sows, hogs and pigs were wilfully and maliciously ingested with poison by a person or persons unknown, as a result of which they died or were ruined in health. Defendant denied this allegation and this is essentially the issue submitted to the jury.

Upon this appeal defendant makes two basic contentions, namely:

(1) there is an absolute failure of proof to establish that the loss was a "direct loss" to the livestock involved and (2) there is an absolute

failure of proof to establish that the sows, hogs and pigs were wilfully and maliciously ingested with poison by a person or persons unknown.

Consideration of these two contentions necessitates an examination of the evidence.

On March 6, 1958, the plaintiff, James Lashmett, Sr., resided in Winchester, Illinois. He owned a farm ¾ of a mile north of Winchester on a public road, and there he raised swine. He also owned and operated a feed mill on this same public road. The mill was adjacent to Winchester.

The public road from Winchester going past the farm runs north and south. A farmhouse is located 100 feet east of the public road. On March 6, 1958, one of plaintiff's sons, Dan Lashmett, resided in this farm house, together with his wife and three small children.

A 32′ x 36′ barn is located about 150 feet or 200 feet southwest of the farmhouse. From Dan's bedroom, on the south side of the farmhouse, he had a clear view of the barn.

In this barn plaintiff raised swine. On March 6, 1958, he had 15 sows ready to farrow, 79 three month old shoats, approximately 80 pounds each, and 49 five week old pigs, 35 to 40 pounds each. These three sizes of swine were kept in separate pens in the barn, although they could have contact, one group with the other group, by sticking their noses through the boards of the wooden pens. The floor of the barn was concrete, and the floor of the feed lots, also separated by separate pens, was concrete.

Plaintiff ground his feed for these animals at his feed mill. He added protein supplement to the grain, and the protein was manufactured by Allied Mills of East St. Louis, Illinois. He prepared three different feed mixes, one for the sows, one for the 80 pound shoats and one for the 40 pound pigs. Mechanically,

284

plaintiff ground the feed at his mill, two (2) tons at a time, and took it to the barn in question and then scooped it into three separate feeders holding two tons each. All of the swine in this particular barn drank from the same water supply. This water was piped underground from a covered well, located 150 feet to the east. The well was a large deep well with a pressure system five feet below the surface. The well was covered over tight with a concrete base and wood platform top. The pressure system pumped the water from the well to a watering tank at the barn. The watering tank at the barn was partially covered over on top. Two large animals or several smaller ones could drink at one time at two hog waterers built into the tank at each end. His sons Dan and Larry helped with the care of these hogs and were in and out of the barn.

The premises were fenced by a 47″ wire fence, barbed on top. The barn doors, two in number, were kept shut but not locked. The swine got to the feed lots on the south side of the barn by walking through openings. At the time of his loss plaintiff had six 75-watt light bulbs burning in the barn and these lights shone through the door openings illuminating the feed lot.

Approximately 300 yards east of this first barn was another barn and there Larry Lashmett, plaintiff's 21 year old son, raised swine. These swine ate from the same food supply, but used different water. Every two or three days Larry would dip feed out of the feeders in his father's barn and carry it in buckets to the barn where his hogs were kept. None of Larry's hogs became sick or died.

A quarter of a mile east of the barn where Larry's hogs were kept, plaintiff kept 120 fat hogs. This barn had no lights and was completely isolated from nearby habitation. The record doesn't show from where

these animals' food supply came. None of these hogs became sick or died.

In addition plaintiff kept between 30 and 35 hogs in pens at the feed mill. None of these hogs became sick or died.

On March 6, 1958, plaintiff went to the barn at 6:30 A.M. and noticed that some of the animals were sick. He noticed a white clear vomit (undigested food) and bloody scours (blood in the waste). He had not noticed bloody scours before. Some of the hogs were wobbly but none were dead. He had been to the barn on the previous day as early as 6:00 A.M. and as late as 9:30 P.M. and did not observe anything wrong with his swine. During the preceding week he had been to the barn at all hours, as late as 2:00 A.M. and as early as 4:00 A.M.

Upon noticing the condition of the swine on the morning of March 6, plaintiff selected two of the sicker looking shoats and had his son Larry take them to Winchester for examination by Dr. Dean Gross, a veterinarian. One of the shoats died enroute. Dr. Gross sacrificed the other shoat and then performed a post mortem examination. He found massive and extensive internal hemorrhages in the animal and diagnosed the condition as being the result of ingestion of a toxic material. Dr. Gross then sent the specimen to Dr. John Ray, a veterinarian at White Hall. Dr. Gross went to plaintiff's farm after posting the shoat, saw the remaining swine and cared for them professionally until March 24.

Dr. Ray examined the specimen and found the hemorrhagic condition testifed to by Dr. Gross and also certain lesions. He was of the opinion that the animal had consumed some toxic material belonging to the dicumeral type and that its trade name was Warfarin.

On March 11, 1958, two live hogs from plaintiff's herd were delivered to and examined by a Mr. V. E. Peterson, a bacteriologist with the Illinois Department of Agriculture at Peoria. He took white blood counts and then performed a post mortem on both animals. He found typical symptoms of hog cholera in both animals and was of the opinion that both animals were infected with hog cholera.

On March 18, 1958, a Dr. Richard M. Thomas of the College of Veterinary Medicine at the University of Illinois performed an autopsy on one of the hogs from plaintiff's herd. The animal was alive when taken from the herd but dead when delivered to Dr. Thomas. He was of the opinion that the hog did not die of Warfarin poisoning but died of hog cholera.

■■ The foregoing testimony demonstrates that initially the jury was required to determine the *cause* of the death of plaintiff's swine that died. Since the testimony shows that all of the swine which appeared sick and died, were acting in the same fashion on the morning of March 6 when plaintiff first observed something wrong, and continued to so act, it is a reasonable inference that all of the sick swine were sick from the same cause. Whether that cause was Warfarin poisoning or hog cholera was a question of fact for the jury. By their verdict the jury necessarily rejected the cause as being hog cholera and found the cause to be Warfarin poisoning as alleged in plaintiff's complaint. Thus if the policy were one which insured plaintiff's swine against death from poisoning this appeal would be comparatively simple of solution. However, it is to be remembered that the risk insured against is, to paraphrase the policy provision, direct loss by wilful or malicious physical injury to or destruction of the swine. We are therefore required to determine whether there is any evidence in the record

before us from which it can be said that there was a question of fact for the jury as to whether or not the death by poisoning was a wilful or malicious act, by someone, whether known or unknown. In determining this question we are not unmindful of the rule which is our guiding light, namely, that plaintiff is entitled to have the evidence considered in the light most favorable to him and is entitled to all inferences and presumptions which may be legitimately drawn therefrom.

■ ■ At the outset we should note that neither counsel for plaintiff or defendant have called our attention to any case involving a comparable set of facts as shown by this record when considered in the light of the policy provisions. Nor has any cause been cited involving an interpretation of similar policy provisions. Our independent search has not disclosed any case falling within either category. Certain fundamentals are available for consideration. Insurance on livestock is regarded as a contract by which the insurer agrees to indemnify the insured against such loss as he may sustain by reason of injury to or death of livestock by the happening of specified risks or causes. 38 C.J., Livestock Insurance, p. 99, Sec. 1; 44 C.J.S., Insurance, Sec. 29. In order that there may be a recovery on the policy, the loss of or injury to the insured livestock must result from the particular peril against which the insured is indemnified. 45 C.J.S., Insurance, Sec. 890, page 963; 38 C.J., Livestock Insurance, p. 106, Sec. 18. The burden is on the plaintiff to prove this fact. 38 C.J., Livestock Insurance, p. 110, Sec. 27; 46 C.J.S., Insurance, Sec. 1321, page 460; Abraham v. Insurance Co. of North America, 117 Vt. 75, 84 Atl. 2d 670, 29 A.L.R. 2d 783.

With the foregoing in mind we now proceed to a further examination of the evidence. Dan Lashmett, who lived in the house adjacent to the barn where the

swine were kept, slept in a bedroom facing the barn. He had at the time three children in his household ranging from 5 down to 1 years of age. He kept three hunting dogs on the place and their dog houses were located about 60 yards west of the barn. On the occasions that a representative of the defendant went to the farm in question, at least one of these dogs barked. Dan Lashmett testified, but gave no testimony of seeing or hearing anything unusual at the barn or around the premises. Although Larry Lashmett helped tend the swine and was in and out of the barn, he likewise gave no testimony of seeing or hearing anything unusual at the barn or around the premises on the occasions when he was there. Plaintiff himself testified that after the swine became sick he made a very careful check of the feeders, the water tank and all appurtenances to see if he could find any evidence of wrongdoing and found nothing. He said no test of the feed or water was made and that he had no evidence of any foreign substance being in the water or feed. He further testified that he had no enemies and had no idea as to how the poison got into the hogs.

■ There is some additional evidence that is worthy of note. Robert Coultas is a farmer, farming land that adjoins that of plaintiff. He raised stock at the time in question, including swine. His feed lots were located about ½ mile from the feed lots of plaintiff. Robert Coultas testified that rats and mice frequented his feed lots and he took measures to control the situation by placing bait stations at various points in the locality of the feed lots. Warfarin was used as the poisoning agent. There was evidence that the rats were eating the Warfarin and it was replenished from time to time. Despite the fact that these rats were eating the Warfarin, Coultas testified that he very seldom saw any dead rats. The plaintiff testified that

he saw rats in the field around his feed lot but none in the barn or lot. There is the testimony in this record that swine eat rats; that Warfarin takes 4 to 6 days to react in an animal and that rats which had eaten Warfarin, if in turn eaten by swine, could develop Warfarin poisoning in the swine. This testimony is probably sufficient to raise an inference that the plaintiff's swine might have been accidentally ingested with the poison. This obviously does not satisfy the provisions of the policy.

■■■■■■ Counsel for plaintiff contend that it is a reasonable inference that some human being must have been the agent by which the poison was introduced. However, by Sec. 437, Chap. 38, Ill Rev. Stat. 1959, it was made a felony to wilfully and maliciously poison any domestic animal. Therefore if we adopt the theory of counsel for plaintiff we are required to infer or presume the commission of a felony from the mere fact that a loss has occurred. We are not aware of any such rule. There is a complete void of any evidence, circumstantial or otherwise, that poison was introduced into the swine by a human being acting wilfully and maliciously. This situation has some striking similarities to the case of Tiffin v. Great Atlantic and Pacific Tea Co., 18 Ill. 2d 48, 162 N.E. 2d 406, wherein the court said:

> "Liability may not be based on imagination, speculation, or mere conjecture, and the question of its existence should be submitted for jury determination only where there is some direct evidence supporting each material allegation of the complaint or some circumstantial evidence from which inferences of such facts clearly preponderate."

Applying this rule to the record before us we are of the opinion that there is no evidence that plaintiff's swine were wilfully and maliciously ingested with poi-

son by a person or persons unknown as alleged in the complaint.

Accordingly the judgment of the Circuit Court of Scott County will be reversed.

Reversed.

CARROLL, P. J. and REYNOLDS, J., concur.