GALE A. COLE et al., Plaintiffs-Appellees, v. COUNTRY MUTUAL INSURANCE COMPANY, Defendant-Appellant.

(No. 11529;

Fourth District—April 27, 1972.

Denby and Dobbs, of Carlinville, and Rammelkamp, Bradney and Hall, of Jacksonville, (Stuart Dobbs and Robert E. Bradney, of counsel,) for appellant.

Phelps & Russell, of Carlinville, (Carl E. Kasten, of counsel,) for appellees.

Mr. JUSTICE CRAVEN delivered the opinion of the court:

This is an appeal from trial, without jury, resulting in a judgment for the plaintiffs of $19,400 with costs of suit, against Country Mutual Insurance Company, and an order thereafter entered denying defendant's motion after judgment.

Plaintiffs owned and operated a farm seven miles west and one mile north of Palmyra in Macoupin County, Illinois. The farm was used for the raising of hogs. Plaintiffs claim damages for the loss by death from suffocation of 485 hogs of the value of $19,400 in a controlled environmental building on said farm, October 1, 1969, allegedly incurred as a direct loss of vandalism and malicious mischief. Defendant had issued an insurance policy covering such hogs for direct loss from vandalism and malicious mischief. The trial court in a bench trial entered judgment for plaintiffs and denied defendant's post trial motion.

Defendant contends on appeal there was no evidence, either direct or circumstantial, of "malicious mischief" as that term is defined by law; that the court cannot infer or presume the commission of a felony from the mere fact that a loss to property has occurred; and that there is a difference in the quantum of proof required when an insurance policy defines "Vandalism and Malicious Mischief" to mean willful *or* malicious physical injury as distinguished from one defining "Vandalism *and* Malicious Mischief" to mean only the willful and malicious destruction of the property covered.

Plaintiffs contend that the hogs died when the electricity on which the swine barn ventilation system was dependent was terminated when an unknown person pulled the master switch, and that this act by its nature was intentional, deliberate, malicious and wilfull.

The evidence produced was that Gale Cole and his father, George, as farmers, raised hogs on Gale's farm; that the nearest farm house is about a half a quarter away; that the hogs were raised in controlled environment buildings, on a platform, farrowed in one building, and then put into a finishing building where they are fed to marketing condition. There were pens on both sides of an aisle in the buildings, and below the pens were pits for manure distribution through slats at the back of the building. Feed augers and vents allow fresh air to be admitted above the pens. By use of electrically operated fans, air is taken from the top of the roof, pulled over the pens and blown out over the pit exhaust or side. There were no windows in the buildings, and when the system was operating properly, doors were kept closed.

All of the electrical power was furnished by M.J.M. electrical co-operative.

The residence of Gale Cole is about 150 or 200 feet from the nearest

hog building (the finishing building), and south of that is the farrowing building. Other buildings in the area are a feed mill, elevator, grain bins and others, forming a part of the entire hog operation.

A master switch controlled all of the electricity to the farm. It was on a utility pole located 80 to 90 feet south-westerly from the finishing building. Testimony varied as to the height of this switch from the ground from 7½ feet to 5½ or 6 feet. The switch was built with a set screw in a bracket. When the lever of the switch was up and behind the set screw, the only way to cut off power was to pull the lever out past the set screw, and then pull the lever all the way down. The power is on when the switch is up and behind the screw an off when the lever is all the way down. However, the power stays on with the lever beyond the set screw and until the lever is halfway down.

Robert Kinser, a veterinarian, testified that when the electricity was off, the fans would not go and there would be no ventilation; that heat produced from the animals causes a marked increase in temperature, rising rapidly; and that this would produce insufficient oxygen or an excess amount of $CO_2$, whereby the animals would be in trouble in about 30 minutes. He further testified that the lack of oxygen, humidity and gas causes a nervousness, creating more heat, humidity and gas, whereby the animals ultimately suffocate. He said the animals would be in trouble and die in an hour.

Raymond Hood, a retired college professor, testified he made tests to determine the amount of force necessary to pull the switch and he determined it would take 6 to 10 pounds to push it out and pull it down. He further testified that the switch could not be thrown unless some person threw it. On cross-examination, he testified that with the lever out from behind the set screw, 1 to 2 pounds of pressure would be required to pull the switch.

Gale Cole testified that he had tested the pressure required to move the lever from behind the screw to a downward position and determined it takes about 35 pounds at a 45° angle. He further testified that when the lever is out beyond the screw position it takes approximately 2 pounds of pressure to pull the switch to "off".

The electrical system was hooked up to a siren and the siren goes off when the power goes off. The siren was in the main bedroom of the Cole house.

On the morning of October 1, 1969, Gale Cole performed his morning chores. The electricity was on and the operation was normal. After his check and work in the morning, Gale, his wife, a son, and George and Mabel Cole went to attend a farm progress show in Springfield, leaving about 9:00 A.M. Four of Gale's children went to school and later that

day returned in a school bus. As they walked down the lane towards home, one and then all heard the siren alarm, indicating termination of the electricity. The children threw open all the doors they could and found one door open in the farrowing house. There was an overpowering stench.

One of the children phoned a neighbor, Floyd Barrow, who came over. They all went to the pole upon which the power lever was located and all observed that the lever was in a straight downward position. When the lever was thrust back in its upward position, the power immediately came back on. This was about 5:30 P.M.

Others then came, including M.J.M. employees, Lowell and Steve Hettick. Finally, Gale and George Cole returned home. They found 485 hogs dead. The next day, Dr. Kinser, Coles' veterinarian, performed tests and found the hogs died of suffocation. Their value was $19,400.

Gale Cole did not examine the switch on the morning of October 1, 1969, but found the power supply working normally and properly in the farrowing house that morning. Also, he was in the finishing house that morning and found the power supply on. When he and his father left, the doors of the building were shut.

Defendant's adjuster, Thomas Miller, testified that he interviewed Gale Cole on October 2, 1969. Gale Cole, on cross-examination, admitted he possibly admitted to Miller on that occasion that the lever had not been behind the set screw on September 22, 1969, when he last examined it, or on October 1, 1969. He then said that he didn't know whether he admitted it or not. Miller testified that when he interviewed Cole, he saw a cat run up the pole.

There was no evidence of footprints or unusual marks in the vicinity of the ground around the pole. There was no evidence of loss or damage to any other items or that anything was missing from the farm. There was evidence that M.J.M. did not turn off the power, and that there was no electrical storm that day at the farm.

It is not necessary for us to decide whether there is a difference in burden or type of proof where the term "vandalism or malicious mischief" is in the policy from one where the term is "vandalism and malicious mischief". We assume that both must be proven in this case.

Defendant primarily contends that plaintiffs failed to prove the intent with which the switch was pulled, relying on *Lashmett v. Country Mutual Insurance Company* (3rd Dist. 1961), 29 Ill.App.2d 281, 172 N.E.2d 394. That case is clearly distinguishable from the present case. In that case, a neighboring farmer was using a position on his property to destroy rats and mice. He also raised hogs. There was evidence that hogs eat rats and that it takes 4 to 6 days for poison to react in an animal that

has eaten it. Even had the hogs eaten rats which had consumed poison, there was no evidence to support that someone had maliciously and wilfully put out the poison. The policy in that case was identical in its provisions with the one here and the court there reversed judgment for plaintiff.

In many of the cases holding liability there is evidence of what actually occurred, that is affirmative evidence. Vandalism and malicious mischief are frequently done secretly and direct proof often cannot be made. Where sand is found in the engine of a motor vehicle or in the gas tank, it would seem evident that it is not accidentally there, but is placed there through some intentional human agency. In *Lanza Enterprises, Inc. v. Continental Ins. Co.* (1962), 142 So.2d 580, the court held that malice need not be proven by direct evidence, but may be inferred by the nature, circumstances and consequences of the act involved.

We reject defendant's contention that plaintiff must prove malice toward the owner of the property. The *Lanza* case specifically rejected such a contention and was not mentioned as a requirement in the *Lashmett* case. In *Smith v. Moran* (2nd Dist. 1963), 43 Ill.App.2d 373, 193 N.E.2d 466, it was said:

> "The term 'malice', in ordinary usage means ill will against a person, but in the legal sense it means a wrongful act done intentionally without just cause or excuse." *Kemp v. Division No. 241 Ry. Employees of America*, 255 Ill. 213, 99 N.E. 389, 399.

The evidence in the instant case rules out an accidental pulling of the electric switch. The height of the switch indicates that someone or some thing did not brush into it accidentally. The door of one of the buildings being opened indicates that some human agency was in the building. The evidence all proves a willful, intended act by a human agency. Circumstantial evidence which gives rise to a reasonable inference is present here sufficient to sustain the trial court's findings that vandalism and malicious mischief caused the damage to plaintiffs. The judgment is affirmed.

Judgment affirmed.

TRAPP, P. J., and SMITH, J., concur.