ELMER BENSON, not Indiv., but as Debtor-in-Possession for Elmer Benson, Indiv. and d/b/a Benson & Sons Denim Den, Debtor, Plaintiff-Appellant, *v.* BRADFORD MUTUAL FIRE INSURANCE CORPORATION, Defendant-Appellee.

Second District   No. 82—752

Opinion filed February 23, 1984.—Rehearing denied February 23, 1984.

Richard J. Mason and Sharon P. Riley, both of Levit and Miller, Ltd., of Chicago, for appellant.

James R. Buck, of Klein, Stoddard & Buck, of Sycamore, for appellee.

PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

Plaintiff's appeal from a directed verdict in favor of the defendant raises the issue of the quantum of proof required to submit a theft claim to the jury in a suit on an insurance policy providing coverage for "[t]heft or attempt thereat, excluding *** mysterious disappearance ***."

Elmer Benson, as a debtor in possession under bankruptcy proceedings (Benson), sued Bradford Mutual Fire Insurance Corporation (Bradford) claiming that 2,400 to 2,500 hogs had been stolen from him sometime between September 1975 and August 1977. This amounted to approximately 60% of his herd. Suit was brought after Bradford had refused to pay the claim, alleging failure to comply with reporting terms under the policy and denying that the loss was from theft.

Benson was a farmer who operated a feed store business in Sandwich, Illinois. In conjunction with his feed store business, he had a feed dealership with Central Soya. Later, the feed store developed into a retail farm clothing store, the Denim Den. In 1975, he began his feeder hog business by entering into an agreement with Central Soya under which he agreed to use Central Soya's complete feed in raising feeder pigs from about 40 pounds up to a market weight of 220 pounds and Central Soya agreed to finance the feed. The process usually took about 16 weeks. Swift and Company agreed to finance the purchase of the feeder pigs, retaining a security interest in them, and agreed to buy the finished pigs for slaughter. Usually Benson purchased feeder pigs weekly from a company in Knoxville, Iowa. After each purchase he sent Swift up a copy of the sales rights and the weight tickets. When the pigs were finished and ready for slaughter, he sold them to Swift at a price $1 under the average hog market price at Joliet and Peoria on the day of sale. Benson conceded that there was a discrepancy of 700 head between his farm ledger and Swift's records.

Benson operated his feeder pig business on his own farm and on seven other nearby farms from March 19, 1977, to March of 1980. His home farm and some of the others were converted cattle farms but several were built for or substantially modified for raising hogs.

Benson introduced bills of sale, purchase agreements with Swift,

and weight tickets to show that he purchased 20,023 feeder pigs during the two-year time period and to show that he sold 15,156 of these to Swift. Accounting for the difference, he testified that Swift replevied 1,763 hogs; he sold 60 hogs to third parties; he used two hogs himself; 12 hogs were accidentally electrocuted; and four hogs died in a road accident. He introduced his farm record books which showed that 375 hogs died in 1976 and 195 died in 1977. Deducting all the hogs accounted for, the records indicate that 2,474 hogs were missing.

Benson testified that he generally counted his hogs when they were purchased and again when they died, were sold, or were otherwise disposed of. A neighboring experienced hog farmer testified that he accounted for his hogs in the same way. Other experienced hog farmers, acquainted with Benson's operation, testified that he maintained good, typical, or reasonable conditions on his farm. Benson testified that there was no evidence of the hogs escaping, but that if they had it was unlikely that large numbers of hogs simply wandered off, because if a hog gets loose it usually stays close to the pen near the other pigs and near food. He did not notice any drop in feed consumption.

Neighboring farmers Alabastro and Leppert testified that they had lost pigs to theft in 1976 and 1977. Alabastro testified that he raised up to 250 head at one time and took a head count once a month. He said he found 100 head stolen in the winter of 1976-77. He said that he found no broken locks, jimmied doors, or tracks but that the theft accounted for the drastic feed drop he had noticed in the prior months. Leppert stated that he raised 600 to 700 feeder pigs and reported 37 pigs stolen in the fall of 1977. He said that he noticed tire tracks which caused him to suspect a theft and to count his pigs. There had been no subsequent evidence that the pigs appeared in the surrounding hog markets.

The farms used by Benson were spread out over 75 miles in two counties, although, Benson testified, the major loss was at his own farm. There were caretakers at the other farms whose responsibility was apparently limited to providing the pens and helping with their feeding and medication. Benson introduced testimony of Patricia Smith who had lived on a farm from which Benson reported 40 pigs missing, in a house 200 yards from the pens, which were 40 feet from the road. She testified that on two occasions she had heard trucks going into the farm and had heard pigs squealing late at night, but she did not look, and saw nothing. Bradford introduced testimony that Patricia Smith had stated to an investigator, however, that she knew nothing about an alleged theft of pigs, or anything about trucks on

the farm.

Benson testified that no explanation other than theft would account for the loss of his pigs. He said that the pens and fences were secure and that the gates were checked daily and wired shut. He stated that despite the careful security, on several occasions gates that were wired shut at night were found open in the morning and that only a human could unwire the gates.

Bradford introduced testimony tending to show that a higher death rate, not accurately reflected in what it characterized as poor bookkeeping methods, accounted for the loss and that Benson's bookkeeping methods were contrary to good farm management practices. An expert pig farmer stated that if he kept as many pigs as Benson did he would take periodic inventory. Benson recorded his death losses in multiples of five which Bradford's farm records expert testified was unlikely actually to occur. Benson's testimony that he kept accurate death records was contrary to his deposition where he stated that he kept no definite death records, only approximations. Also, it was shown that computer printouts kept by his son for a time showed many more deaths than did the farm records for that period. Other evidence was introduced to show that a theft of the magnitude claimed would be unlikely: the sheriff's office failed to uncover evidence of theft; the other thefts in the area had been much smaller and were quickly discovered from signs of theft; and as David Wiber, a hog buyer for Swift testified, it would have taken 12 semi-tractor trailers or 240 pick-up trucks to haul away 2,400 pigs, each loading process would be noisy and would take at least 20 minutes to an hour.

Bradford introduced evidence of other probable causes for Benson's loss. Benson's hired man testified for the defense that many pigs died from overcrowding or exposure. Both Benson and Hyland, the hired man, agreed that the pigs suffered from bloody scours, and that at least once many dead pigs accumulated. Hyland testified to a pile of hogs 20 feet by 20 feet, waist to shoulder high, while Benson testified to a pile of 20 to 25 pigs, that he buried with a front-end loader.

Bradford's expert swine consultant testified that a typical death rate in an operation like Benson's could vary from 8% to 30%; and that the winter of 1976 to 1977 was especially hard on pigs raised in open lots such as Benson's.

At the close of Benson's evidence, Bradford moved for a directed verdict, asserting that insufficient evidence of theft had been introduced. The court denied defendant's motion for a directed verdict. At the close of all evidence, however, the trial court ruled (1) that there

was enough conflicting evidence to go to the jury on the issue of plaintiff's technical compliance with the policy, and (2) that there was insufficient evidence of theft to withstand defendant's motion for a directed verdict.

We review under the standard that "verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorably to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510.) In making this determination all of the evidence must be considered. (37 Ill. 2d 494, 510. See also *Mundt v. Ragnar Benson, Inc.* (1975), 61 Ill. 2d 151, 156-57.) Substantial factual disputes must be resolved by juries, and questions of credibility or the weight of evidence are not to be decided under *Pedrick*. *Spidle v. Steward* (1980), 79 Ill. 2d 1, 10.

Benson has argued that we should apply the *Pedrick* rule to this case "with greater flexibility and tolerance and with appreciation of the practical difficulties of producing evidence," in view of the inherent difficulty of proving theft. We reject the suggestion that *Pedrick* is a variable rule and should be differently applied in an insurance theft case than any other.

It is undisputed that circumstantial evidence may sustain a finding that an insured has suffered a loss covered under a policy of insurance (*Holsapple v. Country Mutual Insurance Co.* (1983), 112 Ill. App. 3d 512, 517; *Cole v. Country Mutual Insurance Co.* (1972), 5 Ill. App. 3d 335, 339). "Circumstantial evidence is the proof of certain facts and circumstances from which the jury may infer other connected facts which usually and reasonably follow according to the common experience of mankind." (*Pace v. McClow* (1983), 119 Ill. App. 3d 419, 423-24.) Circumstantial evidence used to establish a claim need not support only one logical conclusion. It is sufficient if it supports a reasonable inference. (*Mort v. Walter* (1983), 98 Ill. 2d 391, 396.) Facts established by reasonable inferences are considered in directing a verdict. (98 Ill. 2d 391, 397.) But the circumstances upon which the insured relies must support a reasonable conclusion of theft to allow recovery. (See, *e.g.*, *Lashmett v. Country Mutual Insurance Co.* (1961), 29 Ill. App. 2d 281, 290 (insufficient circumstantial evidence to support a reasonable conclusion of poisoning by malicious mischief).) The jury may not base its verdict on speculation, but only on a reasonable inference. *Tiffin v. Great A. & P. Tea Co.* (1959), 18 Ill. 2d 48, 60.

Evidence of theft of livestock is, by the nature of the activity, dif-

ficult to prove. However, cases where livestock thefts were proven presented stronger evidence than plaintiff presented here. Accurate records and close observation permitted relatively swift discovery of the thefts in cases where it was proven. Plaintiff's witness Alabastro who lived in the area and had reported stolen pigs, testified he had noticed a drastic feed consumption drop during the month in which the loss occurred. Plaintiff's witness Leppert testified to tire tracks near the time of his loss.

■ In contrast, defendant took no monthly counts, reported no feed consumption drop, reported no approximate dates when he discovered losses, nor reported any temporal relationship between the unlocked gates or unusual truck noises and any specific losses. Here the sole piece of direct evidence plaintiff presents is that 1,400 pigs disappeared over a two-year period. Plaintiff presents positive circumstantial evidence from which he maintains a jury could reasonably infer theft consisting of mysteriously unlocked gates at unspecified times, and an unusual truck sound at one farm on an unspecified date in June 1977. Plaintiff also submits items of negative circumstantial evidence: (1) that he did not sell or otherwise dispose of the hogs; (2) that he ran his operation adequately; (3) that the pigs did not escape, since escaping pigs would have stayed close to their source of food; and (4) that the pigs did not die since no one reported unusually high deaths at his operations. Some of this testimony was contested, but even viewing this evidence in the light most favorable to plaintiff, it does not support a reasonable inference of theft.

The cases discussed by plaintiff in support of its position do not argue for a contrary conclusion.

In *Cole v. Country Mutual Insurance Co.* (1972), 5 Ill. App. 3d 335, a hog farmer, insured for damages caused by vandalism and malicious mischief, recovered when the main power switch controlling ventilation fans for the hog barn was pulled. The court noted that the height of the switch ruled out any accidental pulling, the power supply was on and Cole had found the ventilation working normally in the morning. Further there was testimony that the doors to the building were shut the morning of the occurrence and were open when the damage was discovered later in the same day. In *Holsapple*, a loss from vandalism and malicious mischief was allowed to go to the jury on similar evidence which ruled out accidental or intentional acts. In *Lashmett v. Country Mutual Insurance Co.* (1961), 29 Ill. App. 2d 281, 290-91, however, a jury verdict based on the finding that sows, hogs and pigs were "wilfully and maliciously ingested with poison by a person or persons unknown," permitting recovery under the vandal-

ism and mischief clause of the insurance policy, was reversed. In *Lashmett*, the court noted that there was no testimony of anything unusual happening at the barn, no barking of watch dogs, and no evidence of wrongdoing before the loss. There was also evidence sufficient to raise an inference that the swine might have eaten rats and accidentally ingested Warfarin, a poison used to kill rats in a neighboring farm about one-half mile from the feed lots of the plaintiff. 29 Ill. App. 2d 281, 288-90.

No case has been found in Illinois considering what quantity of evidence a plaintiff must present to go to the jury in order to prove theft of livestock within the coverage of an insurance policy which excludes mysterious disappearance. There are, however, various cases in other jurisdictions which have been referred to by the parties. A plaintiff must prove more than mere disappearance to prove theft. (*Long v. Glidden Mutual Insurance Association* (Iowa 1974), 215 N.W.2d 271, 272-73.) "Theft" as used in an insurance policy, where it is not defined, is given its popular meaning as covering any wrongful appropriation of another's property to the use of the taker. (*Steinbach v. Continental Western Insurance Co.* (Iowa 1976), 237 N.W.2d 780, 782.) In an action to recover on a policy insuring against theft the same quantum of proof is not required to support a recovery as is necessary to support a conviction for theft under the criminal law. (*Lovas v. St. Paul Insurance Cos.* (N.D. 1976), 240 N.W.2d 53, 55.) "Theft" must be construed to mean something other than escape, mysterious disappearance, inventory shortage, wrongful conversion or embezzlement, because these are specific exclusions in the insurance policy. *Raff v. Farm Bureau Insurance Co.* (1967), 181 Neb. 444, 447, 149 N.W.2d 52, 55. See also *Baugher v. Hartford Fire Insurance Co.* (1974), 214 Kan. 891, 899, 522 P.2d 401, 408.

It is, of course, true that the circumstances in each of the cases dictate whether the insured has offered sufficient proof to go to the jury. Benson places considerable reliance on *Coastal Plains Feeders, Inc. v. Hartford Fire Insurance Co.* (5th Cir. 1977), 545 F.2d 448. In *Coastal Plains*, 512 cattle were missing over a 3½-month period. There was evidence that persons who lived on a "lonesome" dirt road leading to the back pens of the feed lot saw an unmarked cattle truck going up a road toward the lot at dusk without headlights and also heard a truck return down the road in the early hours of the morning, with further evidence that no such large truck had been seen on the road before or since the loss. (545 F.2d 448, 450.) The court declined to decide whether the evidence that was presented tending to show that the disappearance of the cattle was not due to death, sale or rec-

lamation by owners, straying, or miscounting, would have been sufficient by itself to present a jury case. (545 F.2d 448, 453.) In *Lovas v. St. Paul Insurance Cos.* (N.D. 1976), 240 N.E.2d 53, the court refused to set aside a verdict in favor of the insured, applying a standard similar to the *Pedrick* rule. There was evidence that after some hogs had been taken to market a loss of 79 hogs was discovered on January 29, 1974. All hogs had been accounted for on December 20, 1973. At the time of the discovery no breaches were found in the fence, no holes were found under it; the ground was frozen, with testimony that hogs cannot walk on ice; no hog carcasses were discovered in the area; no neighbors reported any stray hogs; and, further, the location of the hog pens was such that they were out of sight of the only house located nearby, and in an area where many trucks capable of carrying the hogs used the road.

In *Baugher v. Hartford Fire Insurance Co.* (1974), 214 Kan. 891, 522 P.2d 401, 29 cattle disappeared from an auction barn on two specific dates. On the first date five cattle were found missing when the view of one of the partners running the auction barn was obscured by a semi-tractor trailer for 15 minutes; and on a second occasion 19 head were found to be missing overnight, with evidence that a gate was found open and a calf was running loose in an alley. Further, there was evidence that one of the auction barn's truck drivers disappeared two weeks after the incident and that a mysterious truck had been seen near the pens on the evening prior to the second loss. The combination of these circumstances was found sufficient to support the jury's verdict finding proof of theft under the policy. 214 Kan. 891, 903, 522 P.2d 401, 411.

In *Raff v. Farm Bureau Insurance Co.* (1967), 181 Neb. 444, 149 N.W.2d 52, the insured claimed that 24 of his 60 hogs were missing. A neighboring farmer told him that some hogs had come to his farm and believing that they belonged to someone other than the insured he had called the other farmer to come and get them. That farmer had determined that they were not his hogs and said he abandoned them at a bridge near his farm. No hog tracks were found near the bridge where the hogs were last seen when the insured looked there several days after the disappearance; and there was no evidence of vehicle tracks in the vicinity of the bridge or on his farm where the hogs could have been loaded. Under these circumstances the court concluded that a most plausible conclusion would bring the loss of the hogs within the exclusions rather than the coverage of the policy and that there was insufficient evidence to go to the jury. 181 Neb. 444, 448, 149 N.W.2d 52, 56.

We find the Illinois cases cited by Benson involving vandalism, which went to the jury, factually dissimilar. In *Holsapple v. Country Mutual Insurance Co.* (1983), 112 Ill. App. 3d 512, the hogs were kept in confinement enclosures, not open feed lots; the loss was confined to a single day when the insured was able to state the exact number of pigs alive in the morning (270); and later in the same day 195 pigs were found dead. In addition, the cause of the electrical failure resulting in the deaths was proved by expert testimony. In *Cole v. Country Mutual Insurance Co.* (1972), 5 Ill. App. 3d 335, the loss of 485 pigs in a confinement enclosure was discovered on the day it occurred, under circumstances almost identical to those in *Holsapple*.

However, in *Lashmett v. Country Mutual Insurance Co.* (1961), 29 Ill. App. 2d 281, a case for the jury based on the claim that the swine were poisoned by human intervention was not made on facts that the insured did not see or hear anything unusual at the barn or around the premises; three hunting dogs on the place located near the barn did not bark; there was no evidence of wrongdoing in connection with the feeders or the water tank; and there was an alternative cause for the poisoning. 29 Ill. App. 2d 281, 288-89.

█ In the case before us, the evidence does not establish a reasonable inference of theft. It was shown that the caretakers were in a position to see the pens and to hear anything unusual, yet, with the exception of Mrs. Smith, who lived on the Moyer farm and who reported hearing a truck in the night once, none of the caretakers testified. Benson did not testify to hearing or seeing anything unusual at his farm where the majority of the pigs, he said, were taken; and there was no evidence that his German Shepherd watch dog warned of intruders on any occasion. Benson testified that he had found gates to his pens open on several occasions, but he could not remember the particular times and there was no testimony which related these circumstances to the loss of his pigs. The testimony as to other thefts in the area were not related in time or place to the loss claimed by Benson. (See *Holsapple v. Country Mutual Insurance Co.* (1983), 112 Ill. App. 3d 512, 517-18.) Benson at no time noticed any reduced feed consumption by his herd. This appears to be contrary to his claim that practically 60% of his herd had been stolen. The nature and quality of Benson's farm records taken as a whole did not amount to positive evidence of the loss by theft. Although there was testimony of the presence of disease in the herd, and although Benson's records showed minimal losses from disease, these records were insufficient, of themselves, to permit a jury to conclude that the losses were by theft and not by mysterious disappearance or other causes excluded

under the policy.

Moreover, Bradford presented a credible explanation which would account for substantially greater losses from disease. Under the circumstances we cannot conclude that theft was either the only logical explanation for the loss or that the evidence viewed under the *Pedrick* standard supports, by reasonable inference, a jury verdict for Benson.

Benson has also claimed error in the exclusion of testimony of a neighboring farmer, Robert Huette, that he lost a substantial number of hogs by theft shortly after Benson ceased his operations. Pursuant to an offer of proof he would have testified that he had a hog feeding operation from five to 12 miles from Benson's farm at four different locations and handled up to 4,500 heads of hogs at a time. The offer of proof, which was denied, showed that there were 640 hogs stolen from his farms during the winter of 1977 and 1978. The trial court concluded that even if the testimony showed thefts in the area, Benson had failed to establish any connection between those thefts and his alleged thefts. We agree. Evidence is relevant if it has a tendency to make a necessary fact more or less probable. (*People v. Free* (1983), 94 Ill. 2d 378, 413.) We agree with the ruling of the trial judge that the particular evidence did not satisfy that test. The determination whether particular evidence is relevant is within the discretion of the trial court and will not be disturbed absent an abuse of discretion. *Kyowski v. Burns* (1979), 70 Ill. App. 3d 1009, 1018.

Benson has also claimed error in the exclusion of evidence that one Bill Congdon confessed to stealing hogs in the area. An offer of proof was made that Michael Olsup, a former deputy sheriff for the Kendall County sheriff's office, could so testify. Olsup was permitted to testify to the fact that Congdon was a convicted farm burglar in the area but was not permitted to go into the confession. Benson relies on the rule that a declaration against interest by a third party is admissible as an exception of the hearsay rule. However, the requirements are that the declarant is unavailable, that the declaration was against the declarant's pecuniary interest when made, that the declarant had competent knowledge of the facts declared, and had no probable motive to falsify. (*Kleeman v. Fragman Construction Co.* (1980), 91 Ill. App. 3d 455, 463.) The party seeking to introduce a declaration against interest has the burden of proving that the declarant is unavailable. (91 Ill. App. 3d 455, 463.) Benson merely showed that Congdon was in prison but offered no proof of efforts to obtain his testimony by his deposition or otherwise. Moreover, Congdon's testimony would have added little since the fact that Congdon had been

convicted of hog thefts from the area is in the record.

The judgment of the circuit court of DeKalb County is affirmed.

Affirmed.

UNVERZAGT and LINDBERG, JJ., concur.