ROBERT L. HEARN, Plaintiff-Appellee and Cross-Appellant, v. AMERICAN RIVER TRANSPORTATION COMPANY, Defendant-Appellant and Cross-Appellee.

Fifth District    No. 5—97—1031

Opinion filed March 11, 1999.

James K. Mondl, of Tonkin & Mondl, L.C., of St. Louis, Missouri, for appellant.

Roy C. Dripps and Gail G. Renshaw, both of Lakin Law Firm, P.C., of Wood River, for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:
Defendant, American River Transportation Company, appeals from

a judgment of the circuit court of Madison County, entered after a bench trial, in favor of plaintiff, Robert L. Hearn, in the amount of $388,150. Plaintiff originally brought this action to recover damages he sustained to his wrist during a fall while working as a deckhand on defendant's boat. Plaintiff filed his complaint raising claims under both the Jones Act (46 U.S.C. app. § 688 *et seq.* (1994)) and general maritime law. The issues raised by defendant on appeal are (1) whether the trial court erred in striking defendant's demand for a jury trial, (2) whether the trial court's decision was against the manifest weight of the evidence, and (3) whether the trial court erred in awarding plaintiff $388,150 in damages for his wrist injury. Plaintiff cross-appeals, arguing that the trial court erred in failing to award plaintiff any damages for the loss of earnings capacity and future wage loss. We affirm.

## I. FACTS

Plaintiff filed suit under both the Jones Act and general maritime law on March 22, 1996. In its answer, defendant demanded a jury trial. On June 11, 1997, plaintiff filed a motion to strike defendant's jury demand. The trial court granted plaintiff's motion on September 26, 1997, over defendant's objection. A three-day bench trial was conducted, starting on October 6, 1997. The following facts were adduced at trial.

Plaintiff, age 43 at the time of trial, was employed as a deckhand aboard the MV Crimson Duke, a line boat owned by defendant. Plaintiff began working on the river when he was 17. Throughout his employment with various companies, plaintiff worked not only as a deckhand but also as a second and third mate and was, therefore, quite familiar with the chain of authority aboard a vessel. In December 1994, plaintiff was a deckhand on the MV Crimson Duke. The crew consisted of a captain, a pilot, a first mate, a second mate, a call watchman, and a deckhand. The recognized chain of command aboard the MV Crimson Duke began with the captain, then the first mate, then the second mate, and finally, the deckhand. Because of plaintiff's past employment as a mate, he was concerned that he would be resented by other members of the crew who might think he was vying for a mate's job if he spoke up too much.

The crew of such a vessel works in 30-day shifts, meaning that a person works aboard the vessel for 30 days and then has 30 days off. Crew members get on and off the boat throughout the month. Once on board, there are two shifts. The first shift, known as the forward watch, runs from 6 a.m. to noon and then from 6 p.m. to midnight. The second watch runs from noon to 6 p.m. and midnight to 6 a.m.

Plaintiff boarded the ship on December 15, 1994, to begin his 30-day shift. On December 25, 1994, during the evening shift of the forward watch, plaintiff was working on the tow. The captain knew that the men were working on the tow because the watchman used a walkie-talkie to communicate with the captain. Everyone was wearing head lamps because the outside guard lamps, which hang from the underside of the deck, were turned off. Before all the tow work was completed, Ray Davis, the second mate, told the crew to return to the vessel and do cleanup.

Plaintiff went to the galley to take care of the trash. The recyclable material needed to be taken to the deck locker, near the bow of the boat, which could only be reached from the outside of the vessel. The trash compactor, which stored the remaining garbage, was in the engine room. Plaintiff first took the recyclables to the deck locker. He returned to the galley and picked up the trash for the trash compactor. Plaintiff walked on the outside of the boat, rather than on the inside of the boat, as a precautionary measure. Plaintiff explained that if the trash bags broke on the inside of the boat, it would cause a mess on the galley floor. Plaintiff testified that he was not working any faster than he thought was safe. While walking outside near the starboard winch, plaintiff raised his foot, but it stopped on a nonskid material that was applied to the deck of the boat. His foot stuck, and he started to lose his balance. He raised his foot to try to catch his balance. Plaintiff knew that a winch wire was located in the area, and he tried to avoid it, but when he raised his foot in an attempt to catch his balance, he stepped on the wire and fell down. Plaintiff hurt his wrist, hands, and knee in the fall.

Plaintiff testified that because the captain was aware that the crew had been doing tow work and had not activated the exterior lights, he assumed that the captain wanted the lights off for a particular purpose. There was testimony from several sources that the exterior lights caused a glare, akin to a dome light being activated while a car is moving. Plaintiff's only lighting was his head lamp, which is similar to a miner's lamp. Plaintiff stated that he could probably see the winch wire, but there were other things he was trying to negotiate in the area. Plaintiff opined that if the deck lights had been on at the time he was taking out the trash, he probably would have been better able to see where he was going. This would have helped prevent his injury because he would have been better able to see the winch, the wires, the buttons, and everything else in the area. When plaintiff stumbled, his head lamp moved, and he believed it snagged on something. Plaintiff testified that he did not call the captain to turn on the lights because he assumed that the captain did not want

them on for some reason and because he assumed that Ray Davis would tell the captain to turn on the lights. According to plaintiff, it was Davis's job to keep everyone abreast of new developments. Plaintiff saw Davis ascending to the wheelhouse, so he assumed that Davis was going up to talk to the captain. Davis did not ask the captain to turn on the lights.

Plaintiff testified that plaintiff's exhibit No. 7 shows the condition of the deck at the time plaintiff fell. Plaintiff's exhibit No. 7 indicates that the deck had an overall blotchy appearance and that there were several different shades of grey paint. Several witnesses testified as to the application of the nonskid coating put on the deck of the MV Crimson Duke. This application occurred in the fall of 1994. All testimony indicated that a nonskid coating is essential on such a vessel because the decks become slick from water, frost, and other unavoidable conditions and that such a coating helps prevent crew members from falling overboard. Prior to fall 1994, the MV Crimson Duke's decks were covered by paint with sand mixed into it. Sometime in 1994, one of the mates of the MV Crimson Duke, Kerry Wills, discussed with other mates and captains the possibility of applying a coarser material, commonly referred to as "Black Beauty," a coal-slag compound that was then being used aboard other vessels. A decision was made to apply Black Beauty to the MV Crimson Duke. It was applied by crew members, including plaintiff, in September and October 1994.

Black Beauty is applied by rolling paint onto an area of the deck and sprinkling Black Beauty onto the wet paint through mayonnaise jars, with holes punched into the top. Once the paint with the Black Beauty on top dries, the excess is swept or blown off. Grey deck paint is then applied on top of the Black Beauty for cosmetic purposes. There is a discrepancy in the record as to how many coats of Black Beauty were applied to the MV Crimson Duke deck. Plaintiff testified that several coats of Black Beauty were applied, resulting in an uneven application. Plaintiff testified that the heavy application of nonskid material on the vessel contributed to his fall. Plaintiff's expert, Pat Jamison, captain of the Argosy IV, a gambling boat, testified that he is not a proponent of Black Beauty or any rough type of nonskid material. He believes that the product is too severe, too rough.

Kerry Wills testified that the crew applied only one layer of Black Beauty and then two coats of deck grey paint. Wills testified that the application was uniform. Wills agreed, however, that if more than one layer of Black Beauty was applied, he would be critical of that because it would be unsafe. The log book, which was introduced into evidence, shows that Wills was on the ship when the deck resurfacing began on

September 9, 1994, but that he got off the boat on September 29, 1994. The deck resurfacing and painting were not complete until October 5, 1994. Plaintiff, on the other hand, first got on the vessel on September 8, 1994, the day before the deck resurfacing began, and was on the vessel throughout the entire process. The log book includes several entries pertaining to the application of both nonskid material and grey deck paint during the period of September 9, 1994, through October 5, 1994. The entries are confusing. We cannot tell from reviewing the log book how many layers of nonskid material were actually applied. Ray Davis, a second mate, testified that only one coat of nonskid material was applied, but Davis did not board the vessel until September 28, 1994.

In addition to painting the deck grey, certain areas were painted with a yellow stripe to warn the crew of potential hazards. For example, the entire outer edge of the deck was painted with a yellow stripe. Prior to 1994, the policy of defendant was to paint yellow stripes underneath the winch wires. However, at the time of the accident in question, no yellow stripes had been painted under the winch wires. First mate Bob Middleton testified that a representative of defendant informed him to stop painting beneath winch wires and that it was no longer defendant's policy to do so. An undated memo outlining this new policy was introduced into evidence. Middleton explained that it is difficult to paint underneath the wires because the placement of the wire changes depending on barge placement. Middleton was impeached on this issue by his deposition testimony. During Middleton's deposition, he did not discuss any new policy on the issue of painting beneath winch wires. Instead, Middleton had explained that the crew had not yet gotten around to painting underneath the winch wires at the time the accident occurred.

After his fall, plaintiff immediately reported his injury and signed an accident report that had been completed by Davis. Plaintiff exited the vessel at defendant's fleet in New Orleans and then went to a local hospital, where X rays were taken. Plaintiff's knee was cleaned and bandaged, a brace was placed on his right hand, and an Ace bandage was placed on his left hand. Plaintiff was sent home and treated by his family physician, who then referred him to Dr. Taylor. Dr. Taylor found two broken fingers on plaintiff's right hand and placed it in a cast. Plaintiff experienced pain in his wrist, elbow, and shoulder. In late January or early February 1995, plaintiff was released for a return to work. Plaintiff returned to his former position as a deckhand and made it through his first 30-day shift. However, after being back on the job, plaintiff experienced problems with his wrist, which seemed to be getting worse rather than getting better. Plaintiff sought additional

treatment from Dr. Glogovac, a board-certified orthopedic surgeon. Dr. Glogovac found that plaintiff's fractures had healed, but he also found that plaintiff had tendinitis in his right elbow and torn ligaments in his right wrist. Plaintiff's elbow was treated and healed by a steroid injection. Surgery was performed on plaintiff's wrist.

During surgery, Dr. Glogovac discovered that some of plaintiff's bones in the right wrist "were quite loose and they were rubbing abnormally against each other," which would be consistent with plaintiff's complaints of pain. Consequently, Dr. Glogovac removed the distal end of the ulna and fused the carpal bones. Plaintiff lost some motion in his right hand due to the fusion. The pins that were inserted during the operation were removed in September 1995, after causing irritation. Plaintiff was kept in a plaster cast for 71 days and was sent to physical therapy. Even after physical therapy, plaintiff's injury resulted in permanent loss of motion and strength. Dr. Glogovac opined that plaintiff had a 50-50 chance of requiring future surgery and that plaintiff would continue to experience pain in direct proportion to the amount of activity in which he might engage. Dr. Glogovac advised plaintiff against returning to work on the river, because plaintiff would be a danger not only to himself but also to others.

After his surgery, plaintiff worked full-time as a janitor, earning $6.90 an hour. Plaintiff attended Black River Technical College, starting in August 1996. Plaintiff received a certificate of industrial electricity and electronics in June 1997. At the time of trial, plaintiff had yet to receive his electrician's license, but he is qualified to work as an electrician. At the time of trial, plaintiff was working as a die-cast operator, earning $7.95 an hour. Plaintiff's earning potential is greater, however, because of his electrical training. A rehabilitation expert testified that plaintiff was "under-employed" at the time of trial. The expert opined that after working three years as an electrician, plaintiff would earn approximately $36,000 per year. Plaintiff's largest salary prior to his accident was in 1988, when plaintiff worked as a first mate and earned $27,000. Plaintiff's earnings for the three years prior to the accident were $21,084 in 1994, $21,084 in 1993, and $21,839 in 1992. Plaintiff testified that unbeknownst to him at the time of his injury, he had been recommended for a mate's position. Plaintiff testified that he still experiences pain in his wrist. He has trouble with simple tasks such as lifting milk jugs or opening jars. Plaintiff testified that he is concerned about his ability to compete in the workforce with those who have not experienced such an injury.

After hearing all the evidence, the trial court found in favor of plaintiff and against defendant. The trial court awarded damages as follows:

| "Past pain and suffering | $ 40,000 |
| Future pain and suffering | $ 100,000 |
| Past loss of normal life | $ 40,000 |
| Future loss of normal life | $ 175,000 |
| Loss of earning capacity | $ 0 |
| Past wage loss | $ 32,500 |
| Future wage loss | $ 0 |
| Future medical expense | $ 650 |
| Total | $ 388,150." |

Defendant now appeals, and plaintiff cross-appeals.

## II. ISSUES PRESENTED BY DEFENDANT

### A. JURY TRIAL

The first issue we are asked to address is whether the trial court erred in striking defendant's demand for a jury trial. Defendant contends that (1) the plain language of the Jones Act affords both parties a jury trial in actions for damages at law, (2) the Federal Employers' Liability Act (FELA) (45 U.S.C. §§ 51 through 60 (1994)), adopted by the Jones Act, confers on defendants the right to a jury trial, (3) depriving defendant of the right to a *jury trial* violates the equal protection clause of the fourteenth amendment to the United States Constitution (U.S. Const., amend. 14), (4) the savings-to-suitors clause preserves the right to try maritime cases in state common law courts, and (5) the Illinois Constitution preserves that right in state actions at law (Ill. Const. 1970, art. I, § 13). Plaintiff responds that the trial court properly struck defendant's demand for a jury trial in accordance with both federal and state laws. We agree with plaintiff.

The Jones Act provides, in pertinent part:

"Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending a common law right or remedy in cases of personal injury to railway employees shall apply ***." 46 U.S.C. § 688(a) (1982).

Time and again this language has been interpreted to mean that only plaintiff has the right to elect a trial by jury. For example, this court recently addressed the identical issue in *Allen v. Norman Brothers, Inc.*, 286 Ill. App. 3d 1091, 678 N.E.2d 317 (1997), and found that only

a plaintiff has the right to elect a trial by jury and that the Jones Act does not confer such a right on a defendant.

■ *Allen* specifically addressed three contentions raised by defendant herein. First, *Allen* concluded that the plain language of the Jones Act gives only a plaintiff the option to elect a jury trial because the Act fails to make mention of a defendant. *Allen*, 286 Ill. App. 3d at 1094-95, 678 N.E.2d at 320, citing *Craig v. Atlantic Richfield Co.*, 19 F.3d 472, 476 (9th Cir. 1994). Second, *Allen* concluded that article I, section 13, of the Illinois Constitution (Ill. Const. 1970, art. I, § 13) does not guarantee a defendant the right to a trial by jury in a Jones Act case because the right to a jury trial as protected by the Illinois Constitution is the right of a trial by jury as it existed at common law. A case brought pursuant to the Jones Act is one that was unknown at common law. Therefore, the provisions of the Jones Act itself govern whether and to what extent there is a right to a jury trial, and the Jones Act provides such a right only to a plaintiff. *Allen*, 286 Ill. App. 3d at 1096, 678 N.E.2d at 321. Third, *Allen* explains that the savings-to-suitors clause of section 1333 of the Judiciary Act (28 U.S.C. § 1333 (1988)) does not afford a defendant in a Jones Act case the right to a jury trial. 286 Ill. App. 3d at 1097, 678 N.E.2d at 321. Defendant offers no new arguments and has failed to convince us that the savings-to-suitors clause affords defendant the right to a jury trial.

●3 *Allen* did not specifically address the issue of whether the FELA, which was adopted by the Jones Act, confers upon a defendant the right to a trial by jury. Defendant contends that because the FELA does not restrict the right to elect a jury trial to the plaintiff, a defendant in a Jones Act case is also afforded the right to elect a jury trial. Likewise, defendant maintains that because section 53 of the FELA gives a defendant the right to have the issue of contributory negligence determined by a jury, defendant herein should have been extended that same right because defendant raised the issue of contributory negligence. Plaintiff replies that defendant's FELA argument ignores the plain language of the Jones Act and that the language of the Jones Act controls over any conflicting FELA language. Again, we agree with plaintiff.

The Jones Act made the provisions of the FELA applicable to seamen injured in the course of their employment. The FELA gives railroad employees a right of recovery for injuries resulting from the negligence of their employer, its agents, or its employees. *O'Donnell v. Great Lakes Dredge & Dock Co.*, 318 U.S. 36, 38, 87 L. Ed. 596, 599, 63 S. Ct. 488, 490 (1943). Prior to the enactment of the Jones Act, a person employed on a vessel was without a remedy in damages for negligence beyond care and maintenance, unless the injury was a con-

sequence of the unseaworthiness of the ship or a defect in equipment. *Warner v. Goltra*, 293 U.S. 155, 159, 79 L. Ed. 254, 257-58, 55 S. Ct. 46, 48 (1934). The Jones Act created a new cause of action at law for seamen for personal injuries arising out of the employer's negligence. *Brown v. C.D. Mallory & Co.*, 122 F.2d 98, 101 (3d Cir. 1941). It is to be liberally construed to carry out its full purpose, which is to enlarge admiralty protection to its wards and those dependent on the seamen's earnings. *Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 87 L. Ed. 239, 63 S. Ct. 246 (1942).

A cardinal rule of statutory construction is that the more specific controls over the general. *Hanson v. Circuit Court of First Judicial Circuit*, 591 F.2d 404, 410 (7th Cir. 1979). "When Congress crafts particular remedies for particular wrongs, the presumption is that these are the exclusive remedies and that such limitations as they may embody are not to be circumvented by extending a more generally worded statute over the subject of the more specific one." *McDonnell v. Cisneros*, 84 F.3d 256, 261 (7th Cir. 1996). Accordingly, the plain language of the Jones Act, the more specific statute, which gives only the plaintiff the right to a jury trial, controls over the more general provisions of the FELA.

Moreover, we recently decided that section 53 of the FELA does not require a jury trial on the issue of a Jones Act seaman's comparative fault. *Gibbs v. Lewis & Clark Marine, Inc.*, 298 Ill. App. 3d 743, 700 N.E.2d 227 (1998). In *Gibbs*, we specifically stated: "[T]he reference to a 'jury' in section 53 of the FELA confers no right on the defendant to demand a jury in a Jones Act case. Such a construction would contravene the plaintiff's expressly articulated right to elect a jury trial or nonjury trial in such cases." 298 Ill. App. 3d at 750, 700 N.E.2d at 232. Nothing submitted by defendant herein convinces us that our reasoning in *Gibbs* was unsound. Relying on *Gibbs*, we again hold that section 53 of the FELA does not require a jury trial on the issue of a Jones Act seaman's comparative fault.

●4 Finally, we address defendant's contention that affording the plaintiff a right to a jury trial in a common law court but denying a defendant that same right violates the equal protection clause of the United States Constitution (U.S. Const., amend. XIV). Plaintiff responds that (1) defendant's argument fails to establish "state action" sufficient to trigger application of the fourteenth amendment, (2) there is no disparate treatment between plaintiff and defendant, and (3) assuming, *arguendo*, that the equal protection clause applies, there is no violation in this case. We agree with plaintiff.

The fourteenth amendment applies only to the states and has no application against the United States. *Bolling v. Sharpe*, 347 U.S. 497,

499, 98 L. Ed. 884, 886, 74 S. Ct. 693, 694 (1954). Thus, the fourteenth amendment's equal protection guarantee does not apply to federal legislation. See, *e.g.*, *Ducharme v. Merrill-National Laboratories*, 574 F.2d 1307 (5th Cir. 1978). Defendant cites to *Shelley v. Kraemer*, 334 U.S. 1, 92 L. Ed. 1161, 68 S. Ct. 836 (1948), but as plaintiff points out, defendant's reliance on *Shelley* is misplaced. *Shelley* dealt with state laws that enforced racially discriminatory real estate covenants, not a federal statute.

Furthermore, the equal protection clause does not prevent the classification of persons merely because one class is affected and another is not, so long as all members of the class are treated alike. The classification cannot be arbitrary but must be founded upon some substantial difference in circumstance or condition properly related to the classification. *Hamilton Corp. v. Alexander*, 53 Ill. 2d 175, 179, 290 N.E.2d 589, 591 (1972). "The prohibition of the Equal Protection Clause goes no further than the invidious discrimination." *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489, 99 L. Ed. 563, 573, 75 S. Ct. 461, 465 (1955). The classification between seaman and railroad employee is not discriminatory or unreasonable. The hazards faced by a seaman and a railroad worker are different.

We cannot find any basis for defendant's claim of a right to a jury trial in the instant action, either in federal or state law. It is plaintiff's right to elect a jury trial or a bench trial under the Jones Act. *Allen v. Norman Brothers, Inc.*, 286 Ill. App. 3d 1091, 678 N.E.2d 317 (1997). We are unconvinced by defendant's assertions to the contrary.

### B. MANIFEST WEIGHT OF THE EVIDENCE

The next issue we are asked to consider is whether the trial court's decision was against the manifest weight of the evidence. Defendant asserts that the trial court erred in finding liability against defendant where both plaintiff and his expert testified that the conditions that existed at the time of the accident were safe. Plaintiff responds that substantial evidence supports the trial court's judgment on liability and damages. We agree with plaintiff.

In a bench trial, the trial judge weighs the evidence and makes findings of fact. *Kalata v. Anheuser-Busch Cos.*, 144 Ill. 2d 425, 433, 581 N.E.2d 656, 660 (1991). A reviewing court will defer to the trial court's factual findings unless they are against the manifest weight of the evidence. *Kalata*, 144 Ill. 2d at 433, 581 N.E.2d at 660. In a nonjury case, the judgment of the trial court will be upheld if there is any evidence to support it. *Brencick v. Spencer*, 188 Ill. App. 3d 217, 544 N.E.2d 91 (1989).

■ The parties agree that plaintiff presents three theories of li-

ability:. first, the deck was improperly surfaced; second, the deck was improperly lit; and third, the winch wire was not highlighted with cautionary yellow paint. The trial court's order entering judgment in favor of plaintiff does not specify under which theory or theories it found defendant liable and is thus the equivalent of a general verdict. A general verdict can be sustained on any basis of liability and will not be reversed due to the impairment of one or more of the theories. *Luther v. Norfolk & Western Ry. Co.*, 272 Ill. App. 3d 16, 23, 649 N.E.2d 1000, 1006 (1995). Liability may not be based upon speculation, imagination, or conjecture. *Tiffin v. Great Atlantic & Pacific Tea Co.*, 18 Ill. 2d 48, 60, 162 N.E.2d 406, 412 (1959). But where there is direct evidence from which reasonable inferences may be made to support a cause of action, the issue of liability is then properly left to the trier of fact. 18 Ill. 2d at 60, 162 N.E.2d at 412-13.

In the instant case, the record supports plaintiff's theory that defendant was liable for the injuries he sustained. First, plaintiff testified that Black Beauty was applied more than one time during September and October 1994 and that an uneven application resulted. Plaintiff was the only person to testify who was on the MV Crimson Duke during the entire time the deck resurfacing was underway. Second, the finding of negligence was supported by photographic exhibits of the scene. Plaintiff's exhibit No. 7 supports plaintiff's contention that Black Beauty was unevenly applied. Plaintiff's expert testified that he believed that Black Beauty was too rough. Third, plaintiff testified that had the exterior lights been activated on December 25, 1994, he would have been able to better negotiate what he was doing. All evidence indicates that the deck lights were not activated on the evening in question because the captain preferred them off, even though he knew the crew was working outside the galley at the time in question. Fourth, if a yellow stripe had been painted under the winch wire after the deck resurfacing was completed, plaintiff would have been better able to see the winch wire. It is clear from the record and the trial court's order that the trial court believed plaintiff over the witnesses presented by defendant. Enough direct evidence was presented from which the trial court could reasonably infer that defendant was negligent.

We cannot agree with defendant's assertion that because both plaintiff and his expert testified that the conditions that existed at the time of the accident were safe, such testimony constituted a binding judicial admission requiring reversal. The record supports plaintiff's assertion that plaintiff and his expert were trying to show that plaintiff did nothing to contribute to the injuries caused by his fall on December 25, 1994. The facts of this case do not show that plaintiff was the sole

cause of this accident or even a significant cause. We cannot say that the trial court's findings on the issues of liability and contributory negligence are against the manifest weight of the evidence.

## C. DAMAGES

■ The final issue raised by defendant is whether the trial court erred in awarding $388,150 in damages for his wrist injury. Defendant contends that the damages assessed by the trial court are not reasonable or supported by the evidence. Defendant specifically challenges the award of $140,000 for pain and suffering and $215,000 for the loss of normal life. Defendant concedes that a total award of $50,000 to $75,000 for these two separate elements might be warranted, but it argues that the award is "widely out of proportion" to plaintiff's injury. We disagree.

A reviewing court will not disturb a trial court's findings as to damages unless those findings are against the manifest weight of the evidence. *Dale v. Luhr Brothers, Inc.*, 158 Ill. App. 3d 402, 410, 511 N.E.2d 933, 937 (1987). Here, plaintiff suffered a debilitating wrist injury, for which he underwent surgery and was forced to switch careers. Plaintiff accepted the challenge of retraining, but the injury makes him slower than his peers. Without a doubt, this injury has caused plaintiff pain and will continue to cause him pain in the future. The award is not so large that it falls outside the flexible limits of fair and reasonable compensation, nor does it shock the judicial conscience.

## III. CROSS-APPEAL

■ Plaintiff cross-appeals, arguing that the trial court erred in failing to award him any damages for the future loss of earning capacity and future wage loss. The record shows that plaintiff has completed training in electronics and has received a certificate of industrial electricity and electronics from Black River Technical College. A rehabilitation expert opined that within three years plaintiff can expect to make $36,000 per year, well in excess of his salary working as either a deckhand or a mate. Accordingly, we find that the trial court's judgment was not against the manifest weight of the evidence.

For the foregoing reasons, the judgment of the circuit court of Madison County is affirmed.

Affirmed.

RARICK, P.J., and WELCH, J., concur.