MARSHA JONES, Indiv. and as Special Adm'r of the Estate of Andrew Jones, *et al.*, Plaintiffs-Appellees, v. CHICAGO OSTEOPATHIC HOSPITAL, Defendant-Appellant.

First District (3rd Division)   No. 1—99—2938

Opinion filed September 20, 2000.—Rehearing denied November 1, 2000.

Robert Marc Chemers and Daniel G. Wills, both of Pretzel & Stouffer, Chtrd., and Nicholas A. Riewer and Leigh Handelman, both of Bollinger, Ruberry & Garvey, both of Chicago, for appellant.

Michael S. Baird, of Stotis & Baird, Chartered, of Chicago, for appellees.

JUSTICE WOLFSON delivered the opinion of the court:

Andrew Jones was born with severe brain damage. He led a debilitative life until he was 1 1/2 years old, when he died of respiratory failure. In their lawsuit, Andrew's parents claimed the professional negligence of the Chicago Osteopathic Hospital was a proximate cause of Andrew's imperfect life and then his death. The jury agreed, returning a $6,300,000 verdict against the hospital, later reduced by $100,000. Chicago Osteopathic Hospital challenges the jury's verdict and several of the trial court's rulings. We affirm.[1]

FACTS

Marsha Jones (Jones) was admitted to Chicago Osteopathic Hospital (the hospital) on the morning of March 3, 1994. She was in her forty-second week of gestation—two weeks past her due date. On

---

[1]After oral argument in this case Justice Cerda recused himself. He was replaced by Justice Hall, who fully participated in the preparation of this opinion.

the evening of March 4, 1994, after more than 30 hours of chemically-induced labor, her uterus ruptured. An emergency caesarean section (C-section) was performed, but when Baby Andrew was born he had severe brain damage due to oxygen deprivation—in technical terms, hypoxic ischemic encephalopathy (HIE)—a condition which was fixed and permanent.

On March 5, 1994, Andrew was transferred to Michael Reese Hospital and, after a brief stay, was placed in a Misericordia Home, where he received the specialized, round-the-clock nursing care he required. Andrew was blind, deaf, and suffered from spastic quadriparesis—a condition which caused Andrew's body to be very stiff and inflexible. Andrew had no control over the movement of his legs and arms, he could not suck or swallow, had to be tube fed, and required almost constant suctioning of his airway. He required oxygen regularly and at times was placed on a ventilator. In September 1995, when Andrew was 1½ years old, he died of respiratory failure.

Jones, individually and as special administrator of Andrew's estate, and Johnny Jones (Andrew's father), filed an 11-count second amended complaint against the hospital and its doctors and nurses, alleging negligence in the handling of Jones' labor. The case proceeded to trial on the survival and wrongful death claims. A jury awarded the estate $4.1 million on the survival claim and awarded the heirs $2.2 million on the wrongful death claim. On the hospital's motion for reduction pursuant to statute (735 ILCS 5/2—1205 (West 1996)), the award of medical costs on the survival claim was reduced by $100,000. All other posttrial motions were denied.

The hospital appeals, asking us to review the following questions: (1) whether the evidence was insufficient to prove the hospital breached the applicable standard of care or that the breach proximately caused plaintiffs' injuries, making it error for the trial court to have denied motions for judgment notwithstanding the verdict (judgment n.o.v.) and new trial; (2) whether the hospital was denied a fair trial due to erroneous evidentiary rulings and jury instructions; and (3) whether the verdict was excessive and based on passion and prejudice, requiring remittitur or a new trial on damages.

DECISION

Motions for Judgment n.o.v. and a New Trial
The hospital first contends the trial court erred when it denied the hospital's motions for judgment n.o.v. and new trial because plaintiffs failed to prove the hospital, through its staff, breached the applicable standard of care or, if a breach was shown, that the breach proximately caused injury.

In *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 509-10, 229 N.E.2d 504 (1967), our supreme court identified the standards by which reviewing courts measure a trial court's rulings on motions for judgment *n.o.v.* and motions for new trial.

An appellate court reviews *de novo* a trial court's decision to grant or deny a motion for judgment *n.o.v.* but, like the trial court, must be careful not to " 'usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way.' " *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132, 720 N.E.2d 242 (1999), quoting *Maple v. Gustafson*, 151 Ill. 2d 445, 452-53, 603 N.E.2d 508 (1992).

■ A motion for judgment *n.o.v.* should be granted only in those cases where "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based upon that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d at 510; see also *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 109, 679 N.E.2d 1202 (1997). As the court said in *People ex rel. Department of Transportation v. Smith*, 258 Ill. App. 3d 710, 714, 631 N.E.2d 266 (1994), "This is clearly a very difficult standard to meet, limiting the power of the circuit court to reverse a jury verdict to extreme situations only." If reasonable minds could differ on the inferences to be drawn or the conclusions to be reached from the facts, "[a] trial court cannot reweigh the evidence and set aside a verdict." *Maple*, 151 Ill. 2d at 452-53.

■ A trial court's decision to grant or deny a new trial, on the other hand, is not reviewed *de novo*, but will be overturned only if the reviewing court finds the trial court abused its discretion. *Maple*, 151 Ill. 2d at 455; *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132-33, 720 N.E.2d 242 (1999). In reviewing the trial court's ruling, we must keep in mind a new trial should be granted only when the jury's verdict is against the manifest weight of the evidence. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d at 509. To be against the manifest weight of the evidence, the opposite conclusion must be clearly evident or the jury's findings must appear unreasonable, arbitrary, or not based on the evidence. *Maple v. Gustafson*, 151 Ill. 2d at 454.

Mindful of these standards, we have examined the record in this case. We find no support for the hospital's claim that either a new trial or judgment *n.o.v.* is warranted.

There appears to be no serious dispute that Baby Andrew suffered severe brain injury at birth and later died due to complications stemming from the injury. The questions for the jury to resolve were

whether the acts or omissions of Chicago Osteopathic Hospital were professionally negligent and whether that negligence caused Baby Andrew's brain damage.

■ Here, as in any medical malpractice action, plaintiffs had the burden of establishing, through expert testimony, the standard of care applicable to the hospital's physicians and nurses, to identify the unskilled or negligent manner in which the hospital's physicians and nurses deviated from that standard, and to show a causal connection between that deviation and the injuries sustained. See *Purtill v. Hess*, 111 Ill. 2d 229, 489 N.E.2d 867 (1986); *Lloyd v. County of Du Page*, 303 Ill. App. 3d 544, 552, 707 N.E.2d 1252 (1999). We believe the trial court could fairly conclude plaintiffs met their burden.

The evidence showed Jones was admitted to the hospital around 11 a.m. on March 3, 1994. She had successfully given birth on three prior occasions. She was a high-risk patient because of her age (she was 39 years old), her weight (she was described as morbidly obese), and because she was two weeks past her due date with no sign of going into labor.

Chemical induction of labor began around noon with the introduction of a prostaglandin gel called Prepidil. This gel, which is injected into the cervix, is supposed to "ripen" the cervix and stimulate labor. A second application of Prepidil was given later that day.

By 5:45 a.m. on March 4, 1994, Jones' labor had not progressed. Her cervix had not dilated and the baby was at -3 station—the same position as when Jones arrived at the hospital. Dr. Frank, a first-year resident in the obstetrics unit, consulted by phone with Dr. Springer, the on-call physician. Dr. Springer gave Dr. Frank orders to begin inducing Jones with Pitocin by intravenous drip, with a beginning flow rate of 6 ccs per hour. The flow rate was to be increased by 6 ccs each hour until contractions were adequate.

At about 8 a.m., Jones began receiving Pitocin. At 11:05 a.m., Dr. Frank wrote an order to "hold Pit[ocin] at 24 ccs," after Jones reported to him her contractions were strong.

Dr. Dedelow, another first-year resident who took over for Dr. Frank, examined Jones at about 3 p.m. Jones' condition was unchanged—she was having strong contractions, but her cervix was not dilating and the baby was not descending into the birth canal.

At 6 p.m., Dr. Dedelow examined Jones again. Jones' cervix had dilated two centimeters, which allowed Dr. Dedelow to place internal probes in Jones' uterus. The probes were attached to a monitor, which recorded on strips of graph paper Jones' contractions and the baby's heart rate. These monitor strips showed Jones' contractions were very strong—so strong that the contractions, at their peak, recorded a pres-

sure which exceeded 100 millimeters of mercury, which was beyond the monitor's scale, and, therefore, outside the boundaries of the machine's graph paper.

A little after 6 p.m., Jones' sister, Eva Walker, arrived at the hospital to be with her sister. As time passed, Eva testified, her sister began showing signs of tiring. Jones also began complaining of being in a lot of pain, which caused Eva to become concerned. Eva attempted to find a nurse or doctor to check on Jones, but could find no one.

After a while, Eva located a nurse, who gave Jones a shot of Demerol for the pain. The Demerol, Eva said, made Jones groggy. Shortly after receiving the Demerol, Jones reported feeling a tearing sensation. Eva became further alarmed. Again, she couldn't find a nurse or doctor, so she called her mother, Elizabeth Walker.

Mrs. Walker testified she telephoned the hospital after getting a frantic phone call from her daughter, Eva. Mrs. Walker spoke to a male doctor and asked him to check on Jones.

After her mother called the hospital, Eva testified, a doctor came into the room and examined Jones. Almost immediately, the doctor instructed Jones to push. Nothing happened.

Next, Eva said, the doctor checked the monitors and left the room. He came back with another doctor, Dr. Herbert, who took one look at Jones and moved her out of the room. Eva was told the baby had to be delivered right away.

The hospital records confirmed Eva's testimony. Jones' chart showed only one nurse's note from 8:15 p.m. to 9:20 p.m.—a note that at 8:43 p.m. Jones was given a shot of Demerol by Orashawn Sirunsoi, a nurse who was not assigned to Jones.

Panarat Bhothachareon, the nurse who was in charge of monitoring Jones, testified she had gone on a 45-minute break sometime around 8:20 p.m. When she returned from break, she checked Jones' chart and saw that Jones had been given Demerol. The next time she checked on Jones, Bhothachareon said, it was about 9:20 p.m.

Dr. Dedelow testified he examined Jones at about 8:45 p.m. and found Jones' cervix had dilated to three or four centimeters. He admitted the monitor strips showed Jones' contractions had been off-scale since 6 p.m. and standard practice suggested delivery by C-section should be considered if a woman in active labor does not completely dilate after two hours of strong contractions. Nevertheless, he did not consult with either the senior resident or the on-call physician. He did not elect to proceed to a C-section. He did nothing. Moreover, he left the room and did not return until about 9:30 p.m.

At 9:44, the record shows, Dr. Dedelow examined Jones and found her cervix fully dilated (10 centimeters). The baby had descended to

+2 station. He turned off the Pitocin and instructed Jones to push. At 9:52 p.m., after Jones had pushed four times, Dr. Dedelow testified, the baby seemed to retract back into the womb. The monitors showed the baby's heart rate decreased significantly—a condition called bradycardia. The decreased heart rate meant the baby was not getting sufficient oxygen.

Dr. Dedelow testified he tried intrauterine resuscitation measures—he turned Jones on her side, gave her oxygen, and tried to stimulate the baby by scratching the top of its head—but the situation did not improve. Dr. Dedelow then called the senior resident, Dr. Herbert.

At 10 p.m., Dr. Herbert saw Jones and ordered a C-section. Jones was taken to delivery and prepped for surgery. An anesthesiologist arrived around 10:15 p.m. and Dr. Herbert made the first incision at 10:20 p.m. Baby Andrew was delivered at 10:24 p.m.

After delivery, the doctors determined Jones' uterus had ruptured in two places and there had been a complete placental abruption (detachment from the uterine wall). When a complete abruption occurs there is no exchange of blood or oxygen from mother to baby.

Defense experts Dr. Thomas Kirschbaum and Dr. David Zbaraz testified the hospital's nurses and doctors acted reasonably under the circumstances and did not breach the standard of care. In reaching this conclusion, the defense experts focused on the events that transpired after 9:44 p.m. on March 4, 1994. Prior to this time, they said, Jones' labor had progressed without any significant problems.

The defense experts said it was reasonable to expect that vaginal delivery was imminent when, at 9:44 p.m., Jones' cervix was fully dilated. Dr. Dedelow appropriately instructed Jones to push. It was at this point, defense experts opined, Jones' uterus ruptured, causing an emergency situation. They could not say what caused the rupture, but they did not believe the Pitocin was the cause since the dosage she was receiving was relatively low.

Dr. Dedelow's reaction to the crisis, the defense experts said, was appropriate—he attempted intrauterine resuscitation measures and, when they failed, proceeded to a C-section operation. Furthermore, the defense experts testified, the operation was performed within a reasonable time. Standards require an emergency C-section be performed within 30 minutes. In this case, Baby Andrew was delivered at 10:24 p.m., 24 minutes after the operation was ordered by Dr. Herbert. Consequently, defense experts concluded, there had been no breach of the standard of care by any of the hospital's staff.

Plaintiffs' expert, Dr. Gerald Zatuchni, disagreed with the defense experts. In his opinion, there were several breaches of the standard of care by the hospital's staff.

First, Dr. Zatuchni said, the hospital failed to provide Jones with an appropriate level of care by trained, qualified personnel. A patient receiving Pitocin, Dr. Zatuchni said, requires close observation because Pitocin is universally recognized to be associated with a higher risk of uterine rupture. The longer a patient is on Pitocin, the higher the risk. This is because Pitocin causes the uterus, which is a muscle, to contract. Like any muscle, the uterus tires when it is worked for a long time. If the Pitocin is continued after there is evidence of tiring—hyperstimulation—the continued contractions may cause the muscle fibers of the uterus to separate or "rupture."

In this case, at 8:45 p.m., Jones had been complaining of severe pain. She had been receiving Pitocin for 12 hours. Also, despite Dr. Frank's order to hold the Pitocin at 24 ccs per hour, the Pitocin, inexplicably, had been increased to 42 ccs per hour and Jones had been having strong contractions for several hours. When Dr. Dedelow examined her, she was only three to four centimeters dilated, with "a long way to go" to get to full dilation (10 centimeters). Yet, Dr. Dedelow did not continue to personally monitor Jones after the 8:45 p.m. examination. In fact, he didn't return to examine Jones until 9:30 p.m. or later.

Additionally, no obstetrical nurse was monitoring Jones since Jones' nurse went on break around 8:20 p.m. and didn't return until 9:20 p.m. or later.

This led to a second breach—the failure of the staff to check the monitor strips and recognize a serious situation which began developing at about 8:50 p.m.

Starting around 8:50 p.m., the monitor strips began showing a number of short, rapid contractions, which, Dr. Zatuchni said, indicated Jones was being hyperstimulated by the Pitocin. The baby's fetal heart monitor also began showing signs of late decelerations—a situation signaling that the baby's oxygen intake may be reduced.

Since no trained personnel was keeping Jones under close observation, no one noticed or interpreted the monitor strips. Dr. Zatuchni testified a reasonably qualified obstetrical nurse, by checking the monitor strips, should have been able to recognize the signs of hyperstimulation of the mother and a pattern of late decelerations of the baby and responded by turning off the Pitocin and calling the doctor. The failure of the obstetrical nurses at Chicago Osteopathic Hospital to make personal observation of Jones from 8:20 p.m. until 9:20 p.m.; the failure of the obstetrical nurses to supervise the delivery of the Pitocin; the failure of the nurses to check the monitors regularly; and the failure of the nurses to notice and interpret the tracings from the monitors, detect the signs of a problem, and respond by turning off

the Pitocin and calling a doctor, were all breaches of the standard of care for obstetrical nurses, said Dr. Zatuchni.

The hospital's doctors also breached the standard of care, said Dr. Zatuchni. A qualified physician should have recognized the signs of hyperstimulation and the baby's late decelerations from the monitor strips. The appropriate response would have been to shut off the Pitocin and begin intrauterine resuscitation measures. If the resuscitation measures did not correct the situation, a C-section should have been ordered.

In this case, Dr. Dedelow failed to anticipate the possibility of hyperstimulation after prolonged Pitocin induction, failed to monitor Jones, and, consequently, failed to observe and interpret the monitor strips. He was not present when Jones reported feeling a tearing sensation around 9 p.m. and, consequently, was unaware Jones, more than likely, experienced a uterine rupture at that time.

A third breach, according to Dr. Zatuchni, was the failure to order a C-section earlier—sometime between 9:15 and 9:30 p.m. on March 4, 1994. In Dr. Zatuchni's opinion, when Dr. Dedelow examined Jones at 9:44 p.m., found her to be fully dilated, and told her to push, Jones had already experienced partial rupture of the uterus. When she began to push, there was further rupture, which led to the baby's bradycardia.

Waiting until 9:44 p.m. to shut off the Pitocin and start intrauterine resuscitation measures, when bradycardia had already begun, said Dr. Zatuchni, breached the standard of care. Had Baby Andrew been delivered earlier, in response to the problems evident from the monitor strips, said Dr. Zatuchni, the prolonged period of severe hypoxia would have been avoided and the brain injury to Baby Andrew would have been prevented or greatly diminished. Waiting until 10:20 p.m. to perform the C-section, Dr. Zatuchni said, was a breach of the standard of care.

In summary, the hospital's breach of the standard of care was not limited to a single act or omission. It was the chain of events during the course of Jones' labor—a series of errors or omissions—which eventually led to Baby Andrew's injury. This chain of events began with the hospital's failure to provide Jones with a proper and necessary level of supervision by qualified obstetrical nurses and physicians at a critical period of her labor. Because Jones' labor was not closely monitored by trained, qualified obstetrical nurses and physicians, indications of hyperstimulation and fetal distress, which appeared on the monitor strips, were not observed or recognized. In turn, the failure to recognize these problems led to two things: one, the Pitocin was not discontinued, which led to uterine rupture; two, there was a delay

in deciding to proceed to C-section, leading to a longer period of hypoxia for the fetus. In short, the hospital was not paying attention. As a result, Baby Andrew suffered severe brain damage.

Finally, Dr. Zatuchni said, even if the hospital's staff had acted reasonably until 9:44 p.m., the delivery which occurred at 10:24 p.m. was not timely. Once bradycardia developed at 9:52 p.m., Dr. Zatuchni explained, delivery by forceps should have been attempted or a C-section should have been accomplished sooner. Under the attendant circumstances, a delivery within the 30-minute standard was not acceptable. An anesthesiologist, Dr. Zatuchni said, should have been available within five minutes.

■ Although, on appeal, the hospital makes disparaging remarks about Dr. Zatuchni's credentials, the fact remains the trial court found him qualified as an expert witness. Furthermore, it is clear to this court Dr. Zatuchni's testimony, in conjunction with the other evidence, provides a solid basis for the jury's verdict against the hospital. See *Witherell v. Weimer*, 118 Ill. 2d 321, 337, 515 N.E.2d 68 (1987) (expert opinion held to a reasonable degree of medical certainty furnishes an adequate basis for jury's finding that causation was proved); *Plooy v. Paryani*, 275 Ill. App. 3d 1074, 657 N.E.2d 12 (1995) (causal connection between negligence and injury may be established by expert testimony regarding medical probabilities); *Swaw v. Klompien*, 168 Ill. App. 3d 705, 714, 522 N.E.2d 1267 (1988) (proximate cause established by expert testimony that injury was caused by treating doctor's failure to treat plaintiff's hematoma). Cases cited by the hospital, in which the expert testimony failed to show a causal connection between the breach and the injury, do not apply.

We find no error in the trial court's denial of the hospital's motions for judgment *n.o.v.* and new trial. The evidence, viewed in a light most favorable to the plaintiffs, does not overwhelmingly support the hospital. Nor does it appear to us that the jury's verdict is against the manifest weight of the evidence.

Trial Errors

A. Violations of *in limine* Orders
■ The trial court granted the hospital's motion *in limine*, barring plaintiffs from making any reference to Dr. Herbert's study on Prepidil or to the fact that Prepidil lacked Food and Drug Administration approval. At trial, after plaintiffs already informed the jury in opening argument and through the testimony of several witnesses that Jones had been included in Dr. Herbert's study, the hospital objected when, in cross-examining Dr. Herbert, plaintiffs asked whether the use of Prepidil contributed to a delay in Jones' labor and delivery.

Ruling on this belated objection, the trial court said: "it is waived as to anything that's come out. I'm not striking anything because you never objected or brought it up." The court, however, barred plaintiffs from making any further inquiry into the matter, saying, "You can argue what is out there, but you may not continue to question her in an area that's already been granted."

After this ruling, the only other mention of Dr. Herbert's Prepidil study came when plaintiffs questioned defense expert, Dr. Zbaraz, about the possible side effects for both Prepidil and Pitocin. The hospital objected. The objection was overruled.

The hospital now argues it was prejudiced by plaintiffs' violation of the *in limine* order because mention of the study "suggested to the jury that the Prepidil combined with the Pitocin to cause the uterine rupture and, worse, that the Hospital was more interested in using Jones as a guinea pig." Because an *in limine* order always remains subject to reconsideration by the court during trial, an *in limine* motion, whether granted or denied, does not preserve issues for review. *Konieczny v. Kamin Builders, Inc.*, 304 Ill. App. 3d 131, 136, 709 N.E.2d 695 (1999). Failure to object to the evidence at trial forfeits the issue on appeal. *Konieczny*, 304 Ill. App. 3d at 136.

Furthermore, violation of a motion *in limine* is not *per se* reversible error. See *People v. Baptist*, 76 Ill. 2d 19, 389 N.E.2d 1200 (1979). In order for a violation of an *in limine* order to serve as the basis for a new trial, the party seeking the exclusion of the evidence must have been deprived of a fair trial. See *Kwon v. M.T.D. Products, Inc.*, 285 Ill. App. 3d 192, 673 N.E.2d 408 (1996).

Here, plaintiffs violated the motion *in limine*. But we find no prejudice flowing from the violation. Several hospital witnesses testified Jones' inclusion in the study did not alter her treatment. In addition, plaintiffs' expert did not denounce the Prepidil study or the hospital's use of Prepidil to induce labor. Nor did plaintiffs attribute any breach of care to Jones' inclusion in the study. Plaintiff's theory of the case was that Jones' uterine rupture was caused by the extended use of Pitocin and had nothing to do with the Prepidil. Under these circumstances, the violation of the order did not deprive the hospital of a fair trial.

■ Another *in limine* order, this one barring "all physicians" from saying how they personally would have handled a particular situation, was allegedly violated when plaintiff cross-examined a defense expert, Dr. Kirschbaum. But, at trial, when plaintiff asked Dr. Kirschbaum, based on his deposition testimony, whether it was his opinion that the C-section should have been called for five minutes earlier, the hospital objected only on the grounds that the question went beyond the scope of direct examination.

Even if we ignore the fact that the hospital is raising a new theory on appeal, we find no error. Plaintiff did not ask Dr. Kirschbaum to say what he would have done but, whether, in his expert opinion, he believed the operation should have occurred sooner. This was part of plaintiff's theory of the case. Certainly, plaintiffs had the right to question a defense expert on the timing of the operation.

## B. Rulings on Motions *in limine*

■ The hospital claims the trial court erred when it granted plaintiffs' motion *in limine* barring Dr. Zbaraz from expressing the opinion that Jones' uterus ruptured because of an "undetected cervical laceration." Our review of the record, however, convinces us this opinion was properly excluded since it was not based on any "specialized knowledge and experience and grounded in recognized medical thought." *Dominguez v. St. John's Hospital*, 260 Ill. App. 3d 591, 595, 632 N.E.2d 16 (1993).

The medical treatise cited by Dr. Zbaraz as support for his opinion—Williams Obstetrics—does not mention tears of the cervix as a possible cause for spontaneous uterine rupture and Dr. Zbaraz admitted he never before witnessed or reviewed a case where an undetected cervical laceration caused uterine rupture. There was no other offer of proof on this issue. Also, though Jones had given birth on three prior occasions, there was no evidence Jones had undergone any prior surgeries or procedures which might have caused such a tear. The doctor's conclusion was pure speculation. The trial court did not abuse its discretion by excluding this testimony.

The hospital was not left without any recourse. The trial court did not prevent defense experts from offering other opinions on the cause of Jones' uterine rupture. Dr. Zbaraz was allowed to testify the rupture occurred "in the lower uterine segment, which is the weakest part of the uterus." He also told the jury, in accord with recognized medical authority, uterine rupture can be associated with prior uterine surgery or other procedures, which may weaken the walls of the uterus.

■ Next, the hospital claims it was prejudiced when the trial court granted plaintiffs' motion *in limine* to bar Dr. Kirschbaum from testifying a subsequent incident at Michael Reese Hospital contributed to Baby Andrew's brain injury.

Again the record does not support the claim. The hospital voluntarily abandoned any objection to the motion when, at trial, defense counsel agreed Dr. Kirschbaum would not offer testimony about the Michael Reese incident.

## C. Closing Argument

■ The hospital alleges it was denied a fair trial when, during clos-

ing argument, plaintiffs' counsel made disparaging remarks about the hospital, incorrectly instructed the jury on the burden of proof, and told the jury there was a presumption of damages. There was no objection to these statements during plaintiffs' closing argument.

Generally, an attorney is given wide latitude during closing argument. *Moore v. Centreville Township Hospital*, 246 Ill. App. 3d 579, 616 N.E.2d 1321 (1993). In addition, failure to object to comments made during closing argument is considered a forfeiture of the error. *Lewis v. Cotton Belt Route—St. Louis Southwestern Ry. Co.*, 217 Ill. App. 3d 94, 576 N.E.2d 918 (1991). Only when the comments constitute plain error may the court consider the claim of error in the absence of objection. *Sutton v. Overcash*, 251 Ill. App. 3d 737, 623 N.E.2d 820 (1993).

In this case, regardless of any forfeiture due to the hospital's failure to object, we find no error. The comments, viewed in context of the entire closing argument, were not improper.

### D. Admission of Evidence

█ The hospital claims the trial court erred on six occasions when it admitted or excluded certain testimony. We decline to conduct an individual examination of each claim. Let it suffice to say we have reviewed the record thoroughly and find no error in the trial court's decisions on the admission of evidence. See *In re Estate of Hoover*, 155 Ill. 2d 402, 615 N.E.2d 736 (1993) (A trial court's evidentiary ruling is a matter of discretion and will not be reversed absent a clear abuse of discretion).

### E. Jury Instructions

█ The hospital first contends the jury instructions and verdict form were flawed because they included, as an element of damages, "loss of normal life." The term "loss of normal life" was introduced in *Smith v. City of Evanston*, 260 Ill. App. 3d 925, 631 N.E.2d 1269 (1994). In *Smith*, the trial court granted a new trial on damages, believing the jury had misunderstood the pattern instruction on disability. The appellate court affirmed, agreeing the jury had been confused by the pattern instruction. The remedy, said the court, was to substitute the term "loss of normal life" for "disability" when instructing the jury at a new trial.

After *Smith*, some courts adopted "loss of normal life" as an element of damages without analysis. See *Hearn v. American River Transportation Co.*, 303 Ill. App. 3d 619, 707 N.E.2d 1283 (1999) (damages for pain and suffering and loss of normal life were within limits of fair and reasonable); *Lang v. Lake Shore Exhibits, Inc.*, 305 Ill. App.

3d 283, 290, 711 N.E.2d 1124 (1999) (verdict form included a category of "loss of normal life resulting from the injury" which, the reviewing court said, is commonly understood to mean compensable damages for disability).

But in *Torres v. Irving Press, Inc.*, 303 Ill. App. 3d 151, 707 N.E.2d 248 (1999), the court, in *dicta*, expressed displeasure with the *Smith* court's substitution of the term "loss of normal life" for "disability" and urged adherence to the recommended pattern jury instruction on "disability." The court said:

> "[W]hat is a normal life? This is an exceedingly subjective standard which makes damages especially difficult to quantify." 303 Ill. App. 3d at 157.

Recently, in *Tornabene v. Paramedic Services of Illinois, Inc.*, 314 Ill. App. 3d 494, 502, 731 N.E.2d 965 (2000), we approved the view expressed in *Torres*:

> "We believe that *Torres* is an accurate statement of Illinois law. The trial court is directed to issue IPI Civil 3d No. 30.04, should the issue arise on remand."

*Tornabene* was decided after the jury trial in this case.

In the case before us, the following instruction was given:

> "If you decided for plaintiff on the survival claim, you must fix the amount of money which will reasonably and fairly compensate the estate for any of the following elements of damages proved by the evidence ***
>
> The pain and suffering experienced.
> The disability experienced.
> The loss of normal life.
> The medical expenses incurred.
> Whether any of these elements of damages has been proved by the evidence is for you to determine."

On the verdict form for the survival count, however, the term "loss of normal life" was listed instead of "disability" as an element of damages.

The term "loss of normal life" has almost universally been interpreted as a component of disability which compensates for a change in the plaintiff's lifestyle. See *Holston v. Sisters of the Third Order of St. Francis*, 247 Ill. App. 3d 985, 1005, 618 N.E.2d 334 (1993) (disability damages include the loss of the enjoyment of life); *Martin v. Cain*, 219 Ill. App. 3d 110, 115, 578 N.E.2d 1161 (1991) (jury's failure to award disability damages was error since there was evidence plaintiff's lifestyle had been changed); *Sands v. Glass*, 267 Ill. App. 3d 45, 50, 640 N.E.2d 996 (1994) (jury ignored proven element of damages when it awarded nothing for disability despite clear evidence that plaintiff's lifestyle had changed).

In *Abbinante v. O'Connell*, 277 Ill. App. 3d 1046, 1052, 662 N.E.2d 126 (1996), the court said it was not an abuse of discretion for the trial court to have substituted a "loss of normal life" instruction for the pattern disability instruction because the *Smith* court's definition of "loss of normal life" as the diminished ability to enjoy the life previously experienced by the plaintiff "was more closely tailored to the evidence presented in this case than the [pattern] disability instruction."

Baby Andrew's injury occurred at birth. There could have been no "lifestyle change" since he never had experienced normal life before the injury occurred. Whether "lifestyle change" is a necessary element of a "loss of normal life" instruction is something we need not decide in this case. We find the trial court erred when it gave the jury a survival count damages instruction that included both "disability" and "loss of normal life." We also find the survival count verdict form, which included loss of normal life but not disability, should not have been used.

The question remains whether the erroneous instruction and verdict form require reversal of the verdict and a new trial on damages. We believe reversal is not required.

"Jury instructions are to be 'considered as a whole and where the jury has not been misled and the [complainant's] rights have not been prejudiced by minor irregularities, those alleged errors cannot serve as a basis for [error].' " *Konieczny v. Kamin Builders, Inc.*, 304 Ill. App. 3d 131, 137, 709 N.E.2d 695 (1999), quoting *Zuelsdorf v. Montgomery Ward & Co.*, 64 Ill. App. 3d 408, 414, 380 N.E.2d 1130 (1978). Here, there can be no question that Baby Andrew suffered severe disabilities. The jury was not asked to compensate for "disability" in addition to "loss of normal life" on the verdict form. The award of $2 million would have been a reasonable award for disability. There was no double award. In the context of this case, we believe the jury reasonably understood "loss of normal life" as the degree of disability Baby Andrew suffered as a result of the injury. Consequently, we find the substitution of the term "loss of normal life" for "disability" on the verdict form did not unfairly prejudice the hospital and does not warrant a new trial on damages.

■ The hospital next contends the father's and siblings' loss of society was not proven and, thus, the jury should not have been allowed to consider their loss as elements of the wrongful death action. Furthermore, says the hospital, the verdict form, which contained separate lines for listing the amount of damages to be awarded to the father and siblings, exacerbated the situation by suggesting damages should be awarded.

We do not agree the trial court erred by allowing the jury to consider the father's and siblings' loss of society as elements of damages. In *Seef v. Sutkus*, 145 Ill. 2d 336, 583 N.E.2d 510 (1991), our supreme court held a rebuttable presumption existed in favor of a parent's loss of society, even when the child is stillborn. Though the presumption does not extend to siblings, they may recover for the "deprivation of the companionship, guidance, advice, love and affection of the deceased," if this element of damages is proven. *In re Estate of Finley*, 151 Ill. 2d 95, 102, 601 N.E.2d 699 (1992). In this case, there was no direct testimony by the siblings about their relationship with Baby Andrew. Lack of direct testimony is not fatal, however, if there is other evidence from which the jury can determine loss of society damages. *DeYoung v. Alpha Construction Co.*, 186 Ill. App. 3d 758, 770-71, 542 N.E.2d 859 (1989).

In this case we learned, through the testimony of Jones and her mother, that the family tried to maintain a bond with Baby Andrew, despite his limited ability to interact. There were occasions, they said, when the father and siblings accompanied Jones to the hospital and the Misericordia Home. Also, Baby Andrew was able to be with the family for Thanksgiving and Christmas. The trial court, when ruling on the posttrial motion, cited photographs which were made part of the record (though not part of the record on appeal), depicting Mr. Jones with Baby Andrew. Though the evidence was limited, there was some basis for allowing the jury to consider the siblings' loss of society as elements of the wrongful death action.

The jury, however, should not have been allowed to apportion the wrongful death damages, and separate lines for that purpose should not have been placed on the verdict form. *Barry v. Owens-Corning Fiberglas Corp.*, 282 Ill. App. 3d 199, 205, 668 N.E.2d 8 (1996). The Wrongful Death Act (740 ILCS 180/0.01 *et seq.* (West 1996)) provides for distribution by the judge, based on a certain statutory formula. *Barry*, 282 Ill. App. 3d at 205.

Despite this error, we conclude here, as we did in *Barry*, the erroneous verdict form does not warrant a new trial on damages. The verdict form, in addition to the separate lines, asked the jury to award a total amount. The record shows the trial court orally instructed the jury on the form, telling it "any amount from 'zero to whatever' could be inserted in the individual blanks as long as the total amount was consistent." There is no evidence the separate lines inflated the overall award, especially since, as the trial court noted, the amounts awarded to the father and brothers was significantly less than the amount requested. In light of these facts, we find no support for the hospital's claim of prejudice stemming from the verdict form.

## F. Excessiveness of the Verdict

The hospital also contends the damages awarded on the wrongful death and survival claims are excessive and the product of passion and prejudice. It asks for a remittitur or a new trial on damages.

■ An award of damages is left "to the sound, intelligent judgment, or good sense, of the jury." *Antol v. Chavez-Pereda*, 284 Ill. App. 3d 561, 571, 672 N.E.2d 320 (1996). A jury award should be reversed on appeal only if it is evident that the amount "resulted from passion or prejudice, and that the amount falls outside the limits of fair and reasonable compensation and shocks the judicial conscience." *Lundquist v. Nickels*, 238 Ill. App. 3d 410, 435, 605 N.E.2d 1373 (1992). If a jury's award falls within the flexible range of conclusions reasonably supported by the evidence, it must stand. *Chambers v. Rush-Presbyterian-St. Luke's Medical Center*, 155 Ill. App. 3d 458, 468, 508 N.E.2d 426 (1987).

■ In light of the nature and extent of Baby Andrew's injuries, which he endured over the 18 months he survived, we cannot say the $4 million awarded Baby Andrew's estate in the survival action was excessive or the product of passion or prejudice. Nor can we say $2.2 million was not fair compensation for the family's loss of society. The evidence showed Marsha Jones to be a dedicated and devoted mother to Baby Andrew during his lifetime. Her loss of his future companionship, love, and affection can hardly be disputed. The father and siblings, too, were denied the opportunity of ever having a relationship with Andrew normally available to fathers and brothers.

## CONCLUSION

For the reasons stated, we affirm the judgment entered by the trial court.

Affirmed.

HALL, P.J., and BURKE, J., concur.